# IN THE SUPREME COURT OF IOWA

No. 12–1323

Filed February 6, 2015

Amended April 16, 2015

**STATE OF IOWA,**

Appellee,

vs.

**SCOTT ROBERT ROBINSON,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

Defendant seeks further review of a court of appeals decision affirming his conviction for first-degree kidnapping. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Ralph R. Potter, County Attorney, and Christine O'Connell Corken, Assistant County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider multiple challenges to Scott Robinson's conviction of first-degree kidnapping allegedly arising out of a sexual assault. Robinson contends that his conviction should be reversed because (1) the evidence showed insufficient confinement to support his kidnapping conviction, (2) he was denied access to barrier-free contact with his counsel prior to trial, (3) photographs of him prior to the assault were improperly admitted into evidence, (4) opinion testimony related to the credibility of the alleged victim was improperly excluded, (5) the jury instruction did not properly define the confinement, and (6) the trial information did not give him proper notice of the first-degree-kidnapping charge. We transferred the case to the court of appeals, which affirmed Robinson's conviction.

We granted further review. When we grant further review of a decision of the court of appeals, we have discretion to select issues for our consideration. In this appeal, we consider two issues. First, whether there is sufficient evidence in the record to support the defendant's conviction for kidnapping and second, whether the defendant is entitled to barrier-free contact with his attorney. Because we conclude the evidence was insufficient to support the conviction, we reverse the conviction. We therefore vacate the court of appeals decision related to the sufficiency-of-the-evidence claim and the barrier-free contact claim, but as to the other issues raised in the brief, we will let the court of appeals opinion stand as the final decision of this court. *See Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 770 (Iowa 2009).

## I. Factual and Procedural Background.

In the early morning hours of October 8, 2011, Dubuque police received a complaint about screaming arising from an apartment. Police

responded to the scene, heard screams from within the apartment, broke into the apartment from which the screams arose, and found the defendant, Robinson, and B.S. half-naked in the bedroom of the apartment. Police arrested Robinson. On October 12, the State charged Robinson by trial information with kidnapping in the first degree in violation of Iowa Code sections 710.1 and 710.2 (2011) and sexual abuse in the second degree in violation of Iowa Code sections 709.1 and 709.3(1).[1] Robinson did not post bail and was held in the Dubuque County Jail pending trial.

When Robinson's counsel sought to meet with him prior to trial, the visiting rooms utilized at the Dubuque County Jail had a Plexiglas barrier between Robinson and his lawyer. There was no pass-through for documents. Video cameras were placed outside the visiting rooms.

Robinson filed a motion seeking an order compelling the State to provide him with barrier-free access to his attorney. After a hearing, the district court entered an order declining to compel barrier-free access for each and every meeting between Robinson and his counsel, but instructed the State to provide Robinson and his counsel with barrier-free access upon a showing of need, such as reviewing documents or video or audio recordings. In the event the jail failed to make such contact available, the district court established an expedited hearing process. At such a hearing, if Robinson made a preliminary showing of need, the State would then have to show a case-specific, individualized suspicion in order to sustain any action denying barrier-free access. The record reveals that no further motions were filed with the court on this issue.

---

[1]The district court dismissed this charge prior to the start of trial.

The kidnapping case against Robinson proceeded to trial. Because the trial-related question we have determined to review in this appeal involves the substantiality of evidence to support Robinson's conviction of kidnapping, we review the evidence in the light most favorable to the State. *See State v. Bass*, 349 N.W.2d 498, 500 (Iowa 1984).

At trial, the evidence showed that on the evening of October 7, 2011, B.S. began drinking at home with her brother and a friend. After police officers arrived at the home and asked them to quiet down, the group decided to continue drinking at downtown bars. Ultimately, they ended up at a bar in East Dubuque, Illinois, that remained open until 3:00 a.m. B.S. met Robinson at the East Dubuque bar.

Robinson invited B.S. to an after-hours party at his apartment. After B.S. and Robinson arrived at the apartment, B.S. wondered why there were no other people at the after-hours party. When B.S. took out her phone to make a call, Robinson grabbed it and threw it behind a chair. B.S. then asked Robinson for a drink. But when Robinson made a visit to the bathroom, B.S. grabbed her purse and ran out the door. B.S. realized, however, that she had left her phone in the apartment and went back to retrieve it. When she reentered the apartment, Robinson shut the front door behind her, locked it, and grabbing her neck and jaw and covering her mouth, dragged her down the hallway to the bedroom. B.S. screamed once in the hallway. After shutting and locking the bedroom door from the inside, Robinson threw her on the bed, got on top of her, and covered her mouth when she started to scream. Robinson tried to force B.S. to have oral sex with him. Robinson then flipped B.S. over on her back, and when she again started to scream, Robinson put his hand over her mouth and began to penetrate her.

Awakened by the noise, a downstairs neighbor phoned the police. When the police arrived, they heard screaming and ultimately broke down the front door and entered the apartment. The officers heard more screaming as they approached the bedroom and after being refused entry, broke down the bedroom door. When they entered the room, they saw Robinson and B.S. both naked from the waist down. B.S. was standing and visibly upset.

Based on the evidence presented at trial, the jury convicted Robinson of kidnapping in the first degree, sexually motivated.

Robinson appealed. We transferred the case to the court of appeals. On the issue of sufficiency of the evidence, the court of appeals focused on the jury instruction which posed the question of whether Robinson confined B.S. "more than what is included in the commission of the crime of sexual abuse." *See State v. McGrew*, 515 N.W.2d 36, 39 (Iowa 1994) ("A defendant 'confines' another person in violation of our kidnapping statue only if the confinement definitely exceeds the confinement that is an inherent incident of the underlying felony."). The court of appeals noted there was substantial evidence that Robinson closed the front door and locked it, thereby requiring police to break the door down in response to screams. The court of appeals further noted the evidence showed that Robinson physically moved B.S. from the living room to the bedroom in a manner that prevented her from escaping and then locked the bedroom door behind him. Robinson then held B.S. in a fashion that prevented her escape. Based on this evidence, the court of appeals found sufficient evidence of confinement to support the kidnapping conviction. The court of appeals further affirmed a pro se challenge to the effectiveness of Robinson's trial counsel on the ground that the instruction on confinement given by the district court was not

erroneous. And lastly, for purposes of this opinion, the court of appeals held that if Iowa Code section 804.20 applies to pretrial detainees regarding access to barrier-free contact with his or her attorney, the provision was violated; however, the court was unclear what remedy was appropriate.

## II. Standard of Review.

On the issue of sufficiency of the evidence, we review claims for correction of errors at law. *State v. McCullah,* 787 N.W.2d 90, 93 (Iowa 2010). A jury verdict finding of guilt will not be disturbed if there is substantial evidence to support the finding. *See State v. Torres,* 495 N.W.2d 678, 681 (Iowa 1993). We consider all the evidence in the record and not just the evidence supporting the finding of guilt. *Id.* The record is viewed in the light most favorable to the State. *Id.* "Substantial evidence must do more than raise suspicion or speculation," *State v. Williams,* 695 N.W.2d 23, 27 (Iowa 2005), it must "convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt," *Torres,* 495 N.W.2d at 681; *see Williams,* 695 N.W.2d at 27; *State v. Corsi,* 686 N.W.2d 215, 218 (Iowa 2004).

On the issue of the defendant's statutory right to barrier-free contact with counsel, we review the defendant's challenge of the district court's interpretation of Iowa Code section 804.20 for correction of errors at law. *See State v. Gonzalez,* 718 N.W.2d 304, 307 (Iowa 2006).

## III. Discussion of Sufficiency of the Evidence to Support Finding of Confinement Under Iowa's Kidnapping Statute.

**A. Introduction.** The concept of the crime of kidnapping has been with us for a long time. At common law, the misdemeanor of kidnapping required removal of the victim out of the country. *See* Natalie A. Kanellis, *Kidnapping in Iowa: Movements Incidental to Sexual Abuse,*

67 Iowa L. Rev. 773, 775 (1982) [hereinafter Kanellis]; *see also* 2 Charles E. Torcia, *Wharton's Criminal Law* § 207, at 491–92 (15th ed. 1994). Following the common law example, early state kidnapping statutes, including Iowa's, required removal out of the state. *See* Kanellis, 67 Iowa L. Rev. at 775 & n.30 (citing Iowa Code § 2588 (1851) (repealed by Iowa Acts ch. 1245, ch. 1 § 1001)). The original penalty for kidnapping was not usually severe. *Id.* at 776. In Iowa, the original kidnapping penalty was imprisonment for five years or a $1000 fine. *Id.* at 776 n.31 (citing Iowa Code § 2588 (1851)).

In the twentieth century, however, the relatively narrow kidnapping statutes were replaced with broader statutes. *See id.* at 776–77. After the kidnapping crimes of prohibition and the Lindbergh tragedy, legislatures often wanted to ensure that kidnapping statutes included holding a person for ransom. *See* Note, *A Rationale of the Law of Kidnapping*, 53 Colum. L. Rev. 540, 540 & n.2 (1953) [hereinafter *A Rationale of the Law of Kidnapping*]; *see also* Kanellis, 67 Iowa L. Rev. at 776–77. Eventually, state kidnapping statutes expanded to include a host of other dangerous circumstances, often using expansive terms and including removal or confinement in the commission of serious felonies such as robbery and sexual abuse. *See* Kanellis, 67 Iowa L. Rev. at 777. In addition to expanding the scope of kidnapping, the new statutes generally significantly increased the penalty for the crime. *See id.* As a result, kidnapping statutes embraced a wide and ill-defined range of behavior which could lead to the most severely punished offenses. *See A Rationale for the Law of Kidnapping*, 53 Colum. L. Rev. at 541–43.

Iowa joined the national trend when revising its criminal code in 1976. As noted by one commentator, a legislative study committee "felt that the kidnapping statute . . . [was] too narrow to adequately deal with

present-day problems. The scope of the offense was expanded accordingly." John J. Yeager, *Crimes Against the Person: Homicide, Assault, Sexual Abuse, and Kidnapping in the Proposed Iowa Criminal Code*, 60 Iowa L. Rev. 503, 526 (1975). The revised criminal code thus expanded Iowa's kidnapping statute to apply when an accused "confines a person or removes a person from one place to another" with "the intent . . . to subject the person to a sexual abuse." Iowa Code § 710.1(3) (1979). The penalty in Iowa for kidnapping in the first degree was also increased to life in prison. *Id.* § 710.2; *id.* § 902.1.

Expanded kidnapping statutes, however, have proved problematic. Taken literally, the statutes could convert every robbery or every sexual abuse into kidnapping with significantly enhanced penalties, as these crimes invariably involve at least some confinement or removal. A substantial body of academic literature arose cautioning that the kidnapping statutes should not be allowed to swallow traditional gradations in crime. *See* B.E.H., *Judicial Construction of Kidnapping Statutes*, 15 Alb. L. Rev. 65, 73–74 (1951) (noting the harshness of application of kidnapping statute to felonies and the vesting of the prosecuting attorney with sole power to charge a person with a much harsher crime); Lonnie E. Woolverton, Note, *Kidnapping and the Element of Asportation*, 35 S. Cal. L. Rev. 212, 217 (1962) (noting it is for the courts to reasonably apply the statute to ensure there is a taking and carrying away of such magnitude as to warrant a kidnapping conviction); *A Rationale of the Law of Kidnapping*, 53 Colum. L. Rev. at 557 (noting extremely harsh penalties may be imposed for conduct of relatively little seriousness); Note, *Movement Incidental to the Commission of a Crime Held Insufficient to Support Indictment for Simple Kidnapping in California*, 110 U. Pa. L. Rev. 293, 294 (1961) (noting convictions for "standstill"

robberies); Note, *Room-to-Room Movement: A Risk Rationale for Aggravated Kidnapping*, 11 Stan. L. Rev. 554, 555 (1959) (observing California kidnapping statute's sweeping inclusion of any movement in the nonransom situation or any detention for extortion has opened the door to broad interpretations that cannot be justified in terms of rationale supporting aggravated kidnapping).

The potential broad application of very serious penalties was addressed by the American Law Institute (ALI) in its Model Penal Code. In its introductory note, the ALI noted that "[m]any prior kidnapping statutes combined severe sanctions with extraordinarily broad coverage, to the effect that relatively trivial restraints carried authorized sanctions of death or life imprisonment." Model Penal Code, Explanatory Note for §§ 212.1–.5, 10A U.L.A. 421 (2001). Because of this extraordinary imbalance, the Model Penal Code kidnapping provisions were "designed to effect a major restructuring of the law of kidnapping." *Id.* Under the Model Penal Code, a defendant could be convicted of kidnapping in connection with an underlying crime only if the removal occurred over "a substantial distance" or if the confinement occurred over "a substantial period [of time] in a place of isolation." *Id.* § 212.1, 10A U.L.A. at 422–23.

Courts struggled with the question of whether the new kidnapping statutes should be applied literally or whether there should be some limiting construction under the theory that the legislature did not intend to abolish the distinctions between various crimes and kidnapping that would result from the literal reading of the statutes. Some early cases took a literalist view that any movement or any confinement could be sufficient to support a kidnapping conviction under applicable state statutes. *See State v. Jacobs*, 380 P.2d 998, 1002–03 (Ariz. 1963) (en

banc) (moving victim at knife point from bathroom to screened porch sufficient movement); *People v. Chessman*, 238 P.2d 1001, 1017 (Cal. 1951) (en banc) ("It is the fact, not the distance, of forcible removal which constitutes kidnapping in the state."), *overruled by People v. Daniels*, 459 P.2d 225, 238 (Cal. 1969); *State v. Morris*, 160 N.W.2d 715, 717–18 (Minn. 1968) (moving victim only 100 to 150 feet sufficient to support kidnapping charge). These courts often observed that the legislature had not adopted the language of the Model Penal Code. *See, e.g.*, *Morris*, 160 N.W.2d at 717 (noting the Minnesota legislature chose not to follow the Model Penal Code and omitted any qualification as to time or distance of removal).

A substantial line of authority emerged to the contrary. A leading case embracing the view that kidnapping statutes should be subject to a limiting construction was *People v. Levy*, 204 N.E.2d 842, 844 (N.Y. 1965). In this case, the New York Court of Appeals reviewed a kidnapping conviction in which defendants stopped the victims' car, got in, and demanded jewelry and cash while the car traveled a distance of twenty-seven blocks. *Id.* at 843. The *Levy* court acknowledged that the applicable kidnapping statute was broadly written to include any restraint of a victim, however, the court declared the kidnapping statute, so construed, "could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompanies these crimes." *Id.* at 844. The *Levy* court further concluded that:

> It is unlikely that these restraints, sometimes accompanied by asportation, which are incidents to other crimes and have long been treated as integral parts of other crimes, were intended by the Legislature in framing its broad

> definition of kidnapping to constitute a separate crime of kidnapping, even though kidnapping might sometimes be spelled out literally from the statutory words.

*Id.* The general rationale in *Levy* has been adopted in a number of jurisdictions and now represents the majority view. *See, e.g., Daniels*, 459 P.2d at 235–38; *People v. Bridges*, 612 P.2d 1110, 1116–17 (Colo. 1980) (en banc); *State v. Reiman*, 284 N.W.2d 860, 873–74 (S.D. 1979); *see also* Frank J. Wozniak, Annotation, *Seizure or Detention for Purpose of Committing Rape, Robbery, or Other Offense as Constituting Separate Crime of Kidnapping*, 39 A.L.R.5th 283, 356 & n.4 (1996 & Supp. 2014) [hereinafter Wozniak] (citing cases and noting that "the majority view is that kidnapping statutes do not apply to unlawful confinements or movements 'incidental' to the commission of other felonies").

 *Levy* is sometimes characterized as embracing what has become known as the "incidental" rule or approach to kidnapping statutes. *See Bridges*, 612 P.2d at 1117. The general notion is that when confinement or removal is part-and-parcel of an underlying crime such as robbery or sexual abuse, such removal or confinement is considered incidental to the underlying crime and does not provide a basis for a separate kidnapping prosecution. In order for an accused to be charged with both kidnapping and the underlying felony, the confinement or removal must be in excess or beyond that normally associated with the underlying crime.

 Even among courts that have departed from a literalist interpretation and adopted the incidental approach, however, there are substantial questions of scope and application. What exactly does it mean for confinement or removal to be incidental to other crimes? Where does a court draw the line between confinement or removal that is merely incidental and that which supports a conviction of both

kidnapping, with its harsh penalties, and the underlying crime? *See* Wozniak at 355–58 (noting different tests for determining whether confinement or removal is sufficient to support conviction of kidnapping and the underlying crime). *See generally* John L. Diamond, *Kidnapping: A Modern Definition*, 13 Am. J. Crim. L. 1, 4–30 (1985) [hereinafter Diamond] (outlining various approaches in California, New York, Michigan, Kansas, and under the Model Penal Code).

In general, the approaches to kidnapping in the context of the commission of other crimes fall into five broad categories. The first category is the traditional "any movement" cases that reject the rationale of *Levy* and apply kidnapping statutes literally. Under this approach, any movement or any confinement, however slight, could expose a defendant to kidnapping for conduct which occurred in the course of committing another felony. *See, e.g., Jacobs*, 380 P.2d at 1002–03; *Chessman*, 238 P.2d at 1017.

The second category of cases hold that movements or confinements intended to facilitate the commission of lesser crimes should be considered incidental to the lesser crime and thus do not give rise to kidnapping. Thus, in *Levy*, 204 N.E.2d at 843–45, the New York Court of Appeals held that an abduction of the victims from in front of their home and driving them a distance of twenty-seven blocks to rob them of their money and jewelry did not give rise to kidnapping. Similarly, in *People v. Lombardi*, 229 N.E.2d 206, 207–08 (N.Y. 1967), the New York Court of Appeals reversed kidnapping convictions in which the defendant drugged women, drove them from Manhattan to a motel in Queens, and held them there for a number of hours as part of attempted sexual assaults. The court held that the confinements involved were incidental to the attempted rapes. *Id.* at 209; *see also Daniels*, 459 P.2d at 226–28, 238

(holding evidence insufficient to support kidnapping in four rapes in which (1) attacker held knife to victim and forced her into car where he raped her; (2) assailants forced their way into victim's home, walked victim through dining room into kitchen, put dishtowel over her face, and raped her; (3) attackers forced way into victim's apartment, one pulled out gun, took victim to couch for oral sex, then took her into adjoining bathroom, raped her, and threatened to rip out phone; and (4) assailants forced their way into victim's apartment at gunpoint, put hand over victim's mouth, walked her toward kitchen and then to bedroom, checking first to see if anyone was present, and then raped her). The "facilitate is incidental" approach removes many cases from kidnapping that might otherwise fall within the literal terms of the statutes.

The Supreme Court of Kansas in *State v. Buggs*, 547 P.2d 720 (Kan. 1976), launched a third line of cases that were less protective of defendants but still removed some situations in which there was removal or confinement from the ambit of kidnapping statutes. In *Buggs*, a woman leaving a store with her son was accosted, told not to try anything, and was forced back into the store, where she was forced down on the floor and was raped by an assailant brandishing a knife. *Id.* at 723–24. The *Buggs* court rejected the approach of *Levy* noting that under the applicable Kansas statute, facilitation of an underlying offense constituted kidnapping. *Id.* at 730–31. The *Buggs* court also rejected the approach in *Daniels*, which placed strong emphasis on the increased risk of harm as an indispensable element for kidnapping in the context of an underlying felony. *Id.* at 731. The *Buggs* court noted that lessening the risk of detection may also trigger kidnapping. *Id.*

The *Buggs* court developed a three-pronged test to determine

> if a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
>     (a) Must not be slight, inconsequential, and merely incidental to the other crime;
>     (b) Must not be the kind inherent in the nature of the other crime; and
>     (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

*Id.* The *Buggs* court offered some examples to illuminate its principles. According to the *Buggs* court:

> A standstill robbery on the street is not kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is.

*Id.* Applying its test, the *Buggs* court concluded the conduct of the defendants constituted kidnapping. *Id.* at 731–32. The court noted the robbery could have been accomplished outside the store, but instead, the defendants forced the victims inside to relative seclusion. *Id.* at 731. The movement, though slight, substantially reduced the risk of detection. *Id.* at 731–32. Therefore, the court held there was a "confinement to 'facilitate' the commission of the robbery and rape." *Id.* at 732.

The approach in *Buggs* was largely followed by the Florida Supreme Court in *Faison v. State*, 426 So. 2d 963 (Fla. 1983). In *Faison*, the accused dragged a receptionist "from her desk in front of a large window to the rear of the office where he sexually assaulted her[,]" "forced her into a nearby restroom and raped her again." *Id.* at 964. In a second incident, the defendant broke into the victim's home, violently dragged her from the kitchen to the bedroom, and raped her. *Id.*

The *Faison* court adopted the *Buggs* test. *Id.* at 966. In applying it, the *Faison* court concluded the evidence supported kidnapping convictions. *Id.* The court noted the sexual assault could have been committed "on the spot" without any movement, and because the victims were moved through doors to a more secluded area, the defendant's actions substantially lessened the risk of detection. *Id.*

It is noteworthy, however, that the *Faison* court drew a strong dissent. According to Justice Boyd, the general principle adopted by the majority, namely, that detentions or removals that are merely incidental to the commission of other felonies should not give rise to a kidnapping prosecution, was correct. *Id.* at 968 (Boyd, J., concurring in part and dissenting in part). Justice Boyd, however, argued movement or confinement is incidental unless it has "sufficient independent significance to justify the [separate charge and conviction] for kidnapping." *Id.* at 969. In order to make that determination, Justice Boyd urged consideration of a number of factors including "location, duration, method, manner, and purpose of the abduction or confinement." *Id.* at 968. According to Justice Boyd, the factors should be considered

> not only in the light of whether the abduction or confinement facilitates the commission of another crime, but also, and principally, in light of whether the factors expose the victim to a risk of physical or mental harm substantially greater than the risk of harm ordinarily encountered by the victim of the forcible felony being committed.

*Id.* He implicitly rejected the notion that a conviction for kidnapping could be upheld when the defendant's action simply facilitated making the crime easier to commit or less susceptible to detection. *Id.* at 969. The approach of the dissent in *Faison*—namely, focusing on the substantial increase in the risk of harm—has been adopted in the

District of Columbia. *See Nelson v. United States*, 601 A.2d 582, 598 (D.C. 1991) (noting that in determining whether confinement is significant to warrant an independent prosecution of kidnapping turned on "whether the kidnapping substantially increased the risk of harm to the victim beyond that inherent in the underlying crime"); *see also Wright v. State*, 581 P.2d 442, 443–44 (Nev. 1978), *modified in part by Mendoza v. State*, 130 P.3d 176, 180 & n.19 (Nev. 2006) (noting that dual convictions are proper "where the movement or restraint serves to substantially increase the risk of harm to the victim over and above that necessarily present in an associated offense . . . or where the seizure, restraint or movement of the victim substantially exceeds that required to complete the associated crime charged").

A fourth line of cases adopted a multifactored approach to determining if there is sufficient evidence independent of the underlying felony to support kidnapping. The leading case is *Government of Virgin Islands v. Berry*, 604 F.2d 221, 227 (3d Cir. 1979). In *Berry*, the court identified four factors to be considered, namely

> (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Id.* The *Berry* approach has been followed by a number of other jurisdictions. *See, e.g., Garza v. State*, 670 S.E.2d 73, 78 (Ga. 2008) (noting the factors are to be reviewed as a whole and that not all four factors need be established to sustain a kidnapping conviction), *superseded by statute in part*, Ga. Code Ann. § 16-5-40, *as stated in Inman v. State*, 755 S.E.2d 752, 755 & n.2 (Ga. 2014); *State v. Stouffer*,

721 A.2d 207, 215 (Md. 1998) (adopting a slightly different multifactored approach); *see also United States v. Howard*, 918 F.2d 1529, 1535–37 (11th Cir. 1990).

Finally, a number of jurisdictions, often after legislative action, follow the approach of the Model Penal Code. These jurisdictions require that confinement occur in a "place of isolation" for a "substantial period" of time. *See, e.g., State v. Bunker*, 436 A.2d 413, 416 & n.3 (Me. 1981); *State v. Brent*, 644 A.2d 583, 589 (N.J. 1994).

The choice of test for determining whether kidnapping may be supported when there is an underlying felony is critical to outcomes. Under the New York approach in *Levy* and its progeny, many if not most robberies and sexual assaults will not give rise to kidnapping charges, while, in contrast, under the Arizona approach in *Jacobs*, only standstill robberies and sexual assaults are outside the scope of kidnapping statutes. *Compare Levy*, 204 N.E.2d at 844, *with Jacobs*, 380 P.2d at 1002–03. The approach in *Buggs* and related cases appears to be an intermediate approach, refusing to limit the scope of kidnapping statutes unless movement or confinement in excess of a standstill crime is "significant" or "substantial" under various tests. *See Faison*, 426 So. 2d at 966; *Buggs*, 547 P.2d at 730–32.

The selection of a particular legal framework, however, does not resolve all controversies. Regardless of the test adopted, there have been serious controversies surrounding the application of any test to particular factual settings. As noted by one court, the applicable test "is not an easy one to apply." *Berry v. State*, 668 So. 2d 967, 970 (Fla. 1996). Another court has noted the hundreds of reported decisions broken down into many discrete categories with "cases sustaining and cases reversing separate kidnapping convictions." *Stouffer*, 721 A.2d at

213. The difficulty of applying legal principles to the facts at hand is demonstrated by the frequency of dissents in important cases involving the application of kidnapping statutes in which there are other underlying crimes. *See, e.g., People v. Martinez*, 973 P.2d 512, 523–27 (Cal. 1999) (Mosk, J., dissenting); *People v. Rayford*, 884 P.2d 1369, 1382–84 (Cal. 1994) (Mosk, J., dissenting); *Ferguson v. State*, 533 So. 2d 763, 765 (Fla. 1988) (Kogan, J., dissenting); *Faison*, 426 So. 2d at 967–69 (Boyd, J., concurring in part and dissenting in part); *Tindall v. State*, 45 So. 3d 799, 803–04 (Fla. Dist. Ct. App. 2010) (Farmer, J., dissenting); *Garza*, 670 S.E.2d at 80–84 (Carley, J., dissenting); *State v. Burton*, 649 So. 2d 694, 700 (La. Ct. App. 1994) (Saunders, J., concurring in part and dissenting in part); *State v. Rosling*, 180 P.3d 1102, 1119–21 (Mont. 2008) (Warner, J., concurring in part and dissenting in part); *State v. Wooten*, 374 A.2d 1204, 1204–11 (N.J. 1977) (per curiam) (Pashman, J., dissenting) (affirming, by equally divided court, kidnapping conviction); *State v. Dixon*, 957 S.W.2d 532, 536 (Tenn. 1997) (Reid, J., dissenting), *overruled by State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012); *State v. Finlayson*, 956 P.2d 283, 295–96 (Utah Ct. App. 1998) (Wilkins, J., concurring in part and dissenting in part); *see also* Diamond, 13 Am. J. Crim. L. at 27 n.147 (noting the difference in application of the *Buggs* test by the Kansas courts and the more liberal application of the same test by Florida courts); Mark M. Dobson, *Criminal Law: 1996 Survey of Florida Law*, 21 Nova L. Rev. 101, 105 (1997) (noting "[the] test has been easier to state than to apply"); Jane Albertson, Note, *Criminal Law: Lowering the Threshold for Kidnapping to Facilitate a Felony*, 35 U. Fla. L. Rev. 528, 533 (1983) (questioning application of test in a fashion that drops kidnapping to an unquestionably low threshold).

Today, it is our turn to consider the difficult issues related to kidnapping in the context of underlying criminal activity.

**B. Iowa Precedents on Confinement.** Because this case involves the question of what quantity and quality of evidence is required to support a kidnapping conviction, a careful review of the facts of Iowa caselaw, as well as the principles established in these cases, is essential for a full understanding of the issues. We therefore review our kidnapping cases in detail.

We first considered the question of the proper approach to kidnapping in the context of the commission of another crime under our current kidnapping statute in *State v. Rich*, 305 N.W.2d 739, 741–42 (Iowa 1981) (citing Iowa Code § 710.1 (1979)). In *Rich*, viewing the facts most favorable to the State, the defendant, a custodian, grabbed the victim from behind in a shopping center, held a sharp object to her back, led her down a corridor to the men's restroom, forced her to lie down on her stomach, tied her hands behind her back, took her into the restroom, and sexually abused her. *Id.* at 740. After the sexual abuse, the defendant took her out of the restroom; temporarily tied her to a bannister with a rag and her bra, which had been ripped off; eventually forced her into a three-wheeled trash container, covering her with trash; and wheeled the trash container into a maintenance room, tying her feet. *Id.* at 741. The defendant eventually wheeled her out of the maintenance room back into the mall area, where she managed to tip the container and run. *Id.* The defendant caught up with her, however, and placed her back into the trash container before she was ultimately able to break free and flee the scene. *Id.*

Recognizing the question of whether to adopt the literal or incidental approach as a question of first impression under our

expanded kidnapping statute,[2] we began our discussion by canvassing the approach to kidnapping statutes in other states. *Id.* at 742–45. We recognized that some courts adopted a literalist view of confinement or removal in their broadly framed kidnapping statutes. *Id.* at 742 (citing *Jacobs*, 380 P.2d at 1002). We quoted at length, however, from *Levy*, for the proposition that broad interpretation of kidnapping statutes could lead to results unintended by the legislature. *Id.* at 742–43. While we cited favorably the policy rationale in *Levy* and *Daniels*, we recognized that in Kansas and Florida the courts seemed to "be giving a restricted application to the New York and California rules," *id.* at 744–45, and "the manner in which rules [related to interpretation of kidnapping statutes in the context of other crimes] are applied differs substantially among the states," *id.* at 743.

After canvassing the cases, we came down firmly on the side of the cases adopting the incidental rule. *Id.* at 745. We recognized every assault, rape, and robbery involves some act of intentional confinement or movement. *Cf. id.* (discussing sexual assault). We reasoned notwithstanding the unqualified language in Iowa Code section 710.1(3), the legislature did not intend to give the prosecution a choice of two penalties of such a disparate nature for sexual abuse. *Id.* We noted under Iowa law a conviction of first-degree kidnapping was punishable

---

[2]A few months prior to *Rich*, in *State v. Holderness*, 301 N.W.2d 733, 739–40 (Iowa 1981), we considered a kidnapping case in which the question of whether Iowa should adopt the incidental approach to our new kidnapping statute was raised. The evidence viewed most favorably to the State showed that the victim was transported by automobile for several miles into the countryside to detain her in isolation and in secret, where she was subjected to various acts of sexual abuse. *Id.* at 736, 740. The detention lasted for over two hours. *Id.* at 740. Because we concluded that the State offered sufficient evidence to support a kidnapping conviction even under the incidental approach, we did not expressly decide the issue in that case. *Id.*

by life in prison, while third-degree sexual abuse was punishable by no more than ten years in prison. *Id.* Further, we doubted the legislature intended the possibility of life in prison to apply to the "usual" case of sexual abuse, in which some movement or confinement occurs. *Id.* We declared such a literal interpretation of the statute "would not be sensible or just." *Id.* We thus concluded the legislature intended that the kidnapping statute be applicable only in situations in which the "confinement or removal definitely exceeds that which is merely incidental to the commission of sexual abuse." *Id.*

The question remained how to determine what confinement or removal is incidental. In now oft quoted language, the *Rich* court concluded

> that our legislature, in enacting section 710.1, intended the terms "confines" and "removes" to require more than the confinement or removal that is an inherent incident of commission of the crime of sexual abuse. Although no minimum period of confinement or distance of removal is required for conviction of kidnapping, the confinement or removal must definitely exceed that normally incidental to the commission of sexual abuse . . . . Such confinement or removal may exist because it *substantially* increases the risk of harm to the victim, *significantly* lessens the risk of detection, or *significantly* facilitates escape following the consummation of the offense.

*Id.* (emphasis added).

The heart of *Rich* was the three-pronged test used for determining whether confinement or removal exceeded that normally incident to the commission of sexual abuse. *Id.* at 745–46. Whether any element of this three-pronged test was satisfied would depend upon the totality of the facts. *Id.* at 746.

Applying our approach to the incidental rule, in *Rich* we concluded the confinement and removal supported the defendant's conviction of kidnapping. *Id.* We noted that merely moving the victim from the mall to

the restroom, in and of itself, was not sufficient to support a kidnapping conviction. *Id.* at 745. We observed, however, that although the doors of the shopping center were locked, the defendant first looked into the restroom and was moving the victim to the bathroom not for comfort, but for seclusion. *Id.* In addition, the defendant had bound the victim, not a normal incident of a sexual attack. *Id.* at 745–46. Further, subsequent to the sexual attack, the confinement of the victim continued in a fashion not incidental to the sexual attack. *Id.* at 746. Under the totality of the facts, we concluded the State had offered sufficient evidence to engender a jury question and avoid a directed verdict of acquittal on the kidnapping charge. *Id.*

We applied the *Rich* tripartite test in *State v. Knupp*, 310 N.W.2d 179, 182–83 (Iowa 1981). In *Knupp*, the defendant picked up the victim in his car on New Year's Eve as she walked across an icy bridge over the Mississippi River. *Id.* at 181. The State offered evidence to show that the victim left the defendant's car at the tollbooth, but a short time later, he returned, opened the passenger door, and asked if she wanted a ride. *Id.* The defendant then seized her by the arm, pulled her into the car, and drove away. *Id.* After driving six or seven blocks, the defendant stopped the vehicle under an overpass. *Id.* After the victim managed to alight from the car, the defendant hit her several times, cut through her clothing with a knife, and forced her back into the vehicle where he committed the sexual act. *Id.*

In *Knupp*, we repeated the tripartite test announced in *Rich*. *Id.* at 182–83. Applying the *Rich* test to the facts, we held in a somewhat conclusory fashion that the conduct of the defendant substantially exceeded that which could have been considered incidental because it

substantially increased the risk of harm and significantly lessened the risk of detection. *Id.* at 183.

In *State v. Marr*, 316 N.W.2d 176, 180 (Iowa 1982), however, we concluded the State failed to produce sufficient evidence under the *Rich* tripartite test to support a kidnapping conviction. In *Marr*, the State produced evidence tending to show the defendant followed the victim by foot when she left a drug store at 10:00 p.m. *Id.* at 177. When the victim was outside her residence, the defendant grabbed her, clamped his hand over her mouth, threatened her not to scream, slammed her against the corner of the building, shoved her to the ground, and dragged her some ten to fifteen feet into a gangway near the victim's house. *Id.* at 177–78. At that point, the defendant began to sexually abuse the victim, who could not scream or breathe because the defendant clutched her throat. *Id.* at 178. Her husband, however, interrupted the attack, which lasted two or three minutes. *Id.*

In *Marr*, we held that the State failed to offer sufficient evidence to support kidnapping under the *Rich* tripartite test. *Id.* at 179–80. We emphasized the intensifiers in *Rich*, expressly stating that under *Rich*, the necessary additional confinement or removal may be present when the actions of the defendant "substantially" increased the risk of harm, "significantly" lessened the risk of detection, or "significantly" facilitated escape. *Id.* at 178–79. We further cited the Model Penal Code's emphasis on preventing robbery and rape from escalating into kidnapping, *id.* at 180 (citing Model Penal Code & Commentaries Part II § 212.1 cmt. 1 (1980)), and a leading Iowa authority for the proposition that to be punishable for kidnapping, the removal or confinement must " 'add substantially to the heinousness of the sexual abuse,' " *id.* (quoting John L. Yeager & Ronald L. Carlson, *Iowa Practice: Criminal Law and*

*Procedure* 66 (1979) [hereinafter Yeager & Carlson]). We contrasted the facts of the case with *Rich*, in which the totality of evidence supported movement for purposes of seclusion, including the binding of the victim's hands and subsequent confinement. *Id.* at 178–79 (citing *Rich*, 305 N.W.2d at 745–46). With respect to *Knupp*, we noted in that case, the defendant pulled the victim into his vehicle, drove for several blocks, hit her several times, and forced her back into the car before the act of sexual abuse occurred. *Id.* at 179. Under the facts of the case, we concluded in *Marr* that the totality of the evidence was not enough to support kidnapping. *Id.* at 179–80.

We also found the evidence insufficient in our next kidnapping case involving the underlying crimes of burglary and assault while committing a felony. *State v. Mead*, 318 N.W.2d 440, 445 (Iowa 1982). In *Mead*, the State offered evidence to show that when the victim and her daughter approached the entrance to their home, the defendant emerged and when they opened the door, walked into the house along with them. *Id.* at 441–42. The defendant grabbed the mother from the back and held a knife to her throat, declaring, " '[T]his woman is dead.' " *Id.* at 442. After the mother freed herself and ran, the defendant struck the daughter in the face and a struggle ensued over her purse. *Id.* The defendant was charged with second-degree kidnapping, first-degree burglary, and assault while participating in a felony. *Id.*

After canvassing the evidence, we applied the *Rich* tripartite test in a verbatim fashion concluding that the state failed to offer sufficient evidence to support the kidnapping charge. *Id.* at 445. Although the mother was seized for a moment, we distinguished the seizure from a detention. *Id.* We observed that "unless we extend kidnapping to nearly any case involving a seizure by a defendant of another person during the

commission of a crime, which we refuse to do, the instant case does not involve sufficient confinement to constitute kidnapping." *Id.* Although the mother may have been briefly confined in place, such an act was insufficient to support a kidnapping conviction. *Id.*

Since *Marr,* we have considered whether the evidence supported kidnapping under the *Rich* tripartite test in a number of cases. In these cases, we have sometimes noted that the confinement or removal substantially exceeded that in *Marr* and *Mead.* For example, in *State v. Newman,* 326 N.W.2d 796, 801–02 (Iowa 1982), we concluded there was sufficient evidence of confinement to support a kidnapping conviction when a seventh-grade student was walking to a friend's house, was enticed by the defendant to enter a truck by the showing of an apparent police badge, was subsequently sexually assaulted and then driven on a road to a location where there were no dwellings where a second sexual assault occurred.

Indeed, in all of our kidnapping cases subsequent to *Marr* and *Mead,* we have found sufficient evidence to support a kidnapping conviction under the *Rich* tripartite test. Most of these cases, however, have involved settings in which confinement or removal beyond that ordinarily associated with the underlying offense was clear. *See, e.g., State v. Griffin,* 564 N.W.2d 370, 372–73 (Iowa 1997) (affirming kidnapping conviction when evidence showed that defendant and victim went to motel where defendant choked, beat, and sexually assaulted her; ordered her to disrobe to prevent her from leaving; told sister who was checking on victim to leave; and continued to confine the victim after assault); *McGrew,* 515 N.W.2d at 38, 39–40 (affirming kidnapping conviction when defendant entered victim's bedroom; placed his hand over her face and mouth; tied her hands behind her back and taped

around her mouth, head, and neck; forced victim into hallway outside her bedroom, down stairway, then back into bedroom; touched steel object to her and sexually abused her; then after attack got up and walked around bed thirty times, searching through drawers and closets, with victim waking up hours later); *State v. Hatter*, 414 N.W.2d 333, 335, 338 (Iowa 1987) (affirming kidnapping conviction when defendant grabbed victim after she left junior high, forced victim into car at knifepoint, handcuffed her, drove five miles to a rural area, engaged in sexual abuse, and released her under promise not to say anything only after car got stuck in mud); *State v. Misner*, 410 N.W.2d 216, 217–18, 223–24 (Iowa 1987) (affirming kidnapping conviction when inmates armed with shanks and knifes captured and detained five guards on one floor, forced officer to release a number of prisoners, locked up a guard in a storage room, bound guards with tape, and claimed guards were held "hostage" and that demands would be forwarded); *State v. Hardin*, 359 N.W.2d 185, 187, 190 (Iowa 1984) (affirming kidnapping conviction on evidence that victim drove defendant home from bar, defendant hit victim in face, dragged her from vehicle, and forced her inside his house for sexual assault);[3] *State v. Ristau*, 340 N.W.2d 273, 274, 276 (Iowa 1983) (affirming kidnapping conviction on evidence similar to that in *Newman*); *State v. Folck*, 325 N.W.2d 368, 370–71 (Iowa 1982) (affirming conviction when victim held over extended period of several hours and was taken to secluded spot where detection was unlikely and

---

[3]In *Hardin*, 359 N.W.2d at 189–90, we were asked to consider revising the *Rich* tripartite test by eliminating the detection and escape prongs and focusing entirely upon the substantial risk of harm beyond that ordinarily incident to the underlying felony. This position was advocated in the pages of the Iowa Law Review and has some support in the caselaw. Kanellis, 67 Iowa L. Rev. at 800–01. We declined in *Hardin* to revise the *Rich* tripartite test. *See* 359 N.W.2d at 190.

substantially increased risk of harm if victim tried to defend herself or escape).

While these cases found that kidnapping convictions were supported based on the evidence, they repeatedly endorsed *Rich* as providing the proper legal framework for analyzing the sufficiency of the evidence. For instance, in *Misner*, 410 N.W.2d at 222, the court reprised the *Rich* tripartite test, noting that confinement or removal must exceed that normally incident to the underlying crime and that confinement or removal sufficient to support a charge of kidnapping may exist if the evidence shows the confinement or removal *substantially* increased the risk of harm, *significantly* lessened the risk of detection, or *significantly* facilitated the escape of the perpetrator. According to *Misner*, the *Rich* standards were "unquestionably the law in Iowa today." *Id.* We referred to the *Rich* tripartite test, with the three intensifiers, in all of our subsequent cases involving kidnapping in the context of the commission of other crimes. *See Griffin*, 564 N.W.2d at 373; *McGrew*, 515 N.W.2d at 39; *Hatter*, 414 N.W.2d at 335–36; *State v. Doughty*, 359 N.W.2d 439, 440 (Iowa 1984); *Hardin*, 359 N.W.2d at 189; *Newman*, 326 N.W.2d at 801; *Folck*, 325 N.W.2d at 371; *Mead*, 318 N.W.2d at 443–44; *Marr*, 316 N.W.2d at 178; *Knupp*, 310 N.W.2d at 183.[4]

---

[4]In most of the incidental rule cases, the defendant is convicted of an underlying crime such as robbery or sexual abuse. Here, the underlying crime of sexual abuse was dismissed prior to trial. There is a question whether the incidental rule applies when the underlying charge is dismissed. *Cf. People v. Salimi*, 552 N.Y.S.2d 964, 964–65 (App. Div. 1990) (holding kidnapping and underlying crime could be merged even when defendant has been acquitted of underlying charge); *State v. French*, 428 A.2d 1087, 1088 (Vt. 1981) (noting merger of crimes has no application to a situation in which no conviction was obtained on the underlying crime). The State does not contend, however, that the incidental rule does not apply because of the dismissal of the underlying sexual abuse charge. As a result, we assume the incidental rule applies in this case.

**C. Application of the *Rich* Tripartite Test.** The challenge here is applying the *Rich* tripartite test to a case in which the evidence supporting independent confinement is markedly less than in many of our cases, but in which there is evidence showing something more than a mere "standstill offense." Our cases have generally held that the substantially-increased-risk-of-harm prong of the *Rich* tripartite test may be satisfied if the duration of confinement substantially exceeds that of the underlying crime. *See, e.g., Griffin,* 564 N.W.2d at 373 (noting victim held overnight); *McGrew,* 515 N.W.2d at 40 (noting four hour confinement). Here, however, the duration of the confinement did not significantly exceed that associated with the underlying sexual abuse. While the victim was dragged from the hallway to the bedroom, the few seconds of additional confinement stemming from this conduct contrasts sharply with other cases in which the duration of the confinement clearly exceeded the time required for the underlying sexual assault. It is hard to say the few extra seconds of confinement within the apartment significantly increased the risk of harm to the victim.

With respect to manner of confinement, our cases often emphasize the use of a weapon or the binding of the defendant in a fashion that exceeds confinement ordinarily incident to sexual abuse. *See, e.g., Griffin,* 564 N.W.2d at 372–73 (The victim was beat and sexually assaulted with a bottle.); *McGrew,* 515 N.W.2d at 38, 39–40 (The victim's hands were tied behind her back and tape was placed around her mouth, head, and neck; further, defendant had a knife and gun with him during attack.); *Hatter,* 414 N.W.2d at 335, 338 (The victim was forced into defendant's car at knifepoint.); *Knupp,* 310 N.W.2d at 181 (The defendant cut through victim's clothing with a knife.); *Rich,* 305 N.W.2d at 740–41 (The victim's hands and feet were bound.). In this case, the defendant

did not use a weapon or bind the victim. He did place his hand over the victim's mouth, but such contact in and of itself was found insufficient to support a kidnapping conviction in *Marr*, 316 N.W.2d at 177, 179. Thus, an important factual feature of many of our cases upholding kidnapping convictions—the use of a weapon or the binding of the victim beyond that needed to accomplish sexual abuse—is not present here.

There was, however, at least some additional evidence that may be cited as increasing the risk of harm or lessening the possibility of detection. The State offered evidence that the defendant locked the front door of the apartment and the door to the bedroom during the incident. And, the State offered evidence that prior to the alleged sexual assault the defendant grabbed the victim's cell phone and threw it over a chair in the living room.

Overall, the evidence is less substantial than in many of our kidnapping cases. But that is not the question. The question is whether it is so insubstantial that, as a matter of law, the defendant's kidnapping conviction cannot stand.

There are filaments in our cases that point in both directions. For instance, in *Griffin*, 564 N.W.2d at 373, the defendant confined the victim after the sexual assault by preventing her from making contact with others, thereby lowering the risk of detection. It could be argued that by seizing the victim's cell phone and throwing it over a chair, the defendant accomplished the same thing. A cell phone, however, ordinarily does not provide a realistic vehicle for exposing the crime when the confinement for all practical purposes is limited to the period of time of the sexual assault itself. And in *Griffin*, the confinement in the motel room lasted overnight and into the next afternoon, far beyond that normally incident to the crime of sexual abuse. *Id.*

In addition, the State offered evidence that the victim was confined while being moved from the hallway into the bedroom and that the defendant locked the doors to both the main door of the apartment and the bedroom. In *McGrew*, 515 N.W.2d at 40, we held that the relatively short movement of a victim into a bedroom for purposes of seclusion is a factor that may be considered in determining whether a defendant may be convicted of kidnapping during the course of committing another felony. *McGrew*, however, also involved the binding of the hands and the detention of the victim for a four-hour period, and thus under the totality of circumstances, we concluded that there was a substantial increase in the risk of harm. *Id.* at 39–40. In contrast to *McGrew*, we held in *Marr* that the confinement associated with throwing a victim against the corner of a house and dragging her ten to fifteen feet into a gangway between houses was insufficient to support a kidnapping conviction. 316 N.W.2d at 177–78, 179.

Except for the locking of the doors, this case seems roughly analogous to *Marr*. While the defendant did lock the doors to the apartment and the bedroom, the victim was not locked in, rather, other persons were locked out. The doorway to the apartment was in a residential structure which would ordinarily be locked at night when there would be few curious passersby. While this action may have marginally lessened the risk of detection, the crime occurred within a short period of time in the same enclosed space. The victim was not moved from a public to a private, more secluded, environment.

While the underlying kidnapping statutes and applicable legal tests in the various states are not identical and the facts have many permutations, there is some authority from other jurisdictions for the proposition that evidence like that offered here is insufficient to support

kidnapping. In *Tindall*, 45 So. 3d at 800, the state offered evidence that at two different times the defendant grabbed each victim and pulled her inside his home and into his bedroom, which he subsequently locked, and sexually battered each victim. The Florida appellate court held that the confinement lasted only so long as the actual battery. *Id.* at 802–03. Further, citing applicable Florida authority, the *Tindall* court noted that " 'there can be no kidnapping where the only confinement involved is the sort that though not necessary to the underlying felony, is likely to naturally accompany it.' " *Id.* at 803 (quoting *Berry*, 668 So. 2d at 969).

Somewhat similar is *State v. Goodhue*, 833 A.2d 861 (Vt. 2003). In *Goodhue*, the Vermont Supreme Court considered a case in which the state offered evidence to show that the defendant entered through a kitchen door and ordered a twelve-year-old girl into an adjoining bathroom for purposes of sexual assault. *Id.* at 862. The *Goodhue* court, after canvassing the history of kidnapping and the problems of applying Vermont's statute literally, held that the additional confinement was insufficient to support an independent prosecution for kidnapping. *Id.* at 864–69.

Reading between the lines in *Tindall* and *Goodhue*, it appears there may be some reluctance to find the independent crime of kidnapping when the additional confinement or removal occurs within an enclosed structure. Such additional confinement or movement within an enclosed structure may not be a sufficiently significant change in the risk environment to substantially increase the risk of harm, significantly lessen detection, or significantly aid escape.

On the other hand, there is authority to the contrary.[5] For example, in a case resembling ours, in *Burton v. State*, 426 A.2d 829, 831–32, 835 (Del. 1981), the Delaware Supreme Court held that when a defendant grabbed and twisted a victim's arm, forced her to move from room-to-room several times, and raped her twice, there was sufficient confinement present to support a kidnapping conviction. In *Burton*, as here, the length of time of any additional confinement was quite short, approximately thirty minutes, and occurred within an enclosed structure. *Id.* at 832–33.

The above cases are only meant to illuminate the problem. The leading annotation on the subject currently boasts 549 pages of fine squibs from the caselaw. Wozniak at 283–762 & Supp. 24–94. These authorities could be endlessly sliced and diced but to little effect. That said, there are a number of cases in which room-to-room movement has been found sufficient and in which locked doors and telephone

---

[5]Like the confinement cases, the cases considering whether there was sufficient removal to support a kidnapping charge when a victim is moved from one room to another within an existing structure have reached differing results. In some cases, the movement from one room to another within a structure has been held insufficient removal to support a kidnapping charge. *See, e.g.*, *Buggs*, 547 P.2d at 731 ("The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping."); *Goodhue*, 833 A.2d at 868 (holding movement of victim from kitchen to bathroom did not exceed confinement or removal inherent in the commission of the crime of sexual assault). In other cases, such removal has been found sufficient, often on the grounds that the movement made the crime easier to commit or made detection less likely. *See Faison*, 426 So. 2d at 966 (holding movement from kitchen to bedroom by substantial force made rapes easier to commit and reduced the danger of detection, even though only short distance involved); *State v. Key*, 636 S.E.2d 816, 821 (N.C. Ct. App. 2006) (holding "removal of [victim] from one room to another was not mere asportation, but sufficient evidence of a separate and independent act"); *State v. Scott*, No. 88AP-346, 1988 WL 102010, at *9 (Ohio Ct. App. Sept., 29, 1988) (finding dragging victim back to bedroom and slamming the door closed prevented her escape and pushing her causing her to fall increased the risk of harm). According to one commentator, "[m]ost courts try to avoid kidnapping convictions when movement is within the same room, or from room to room within a home or office." Kanellis, 67 Iowa L. Rev. at 797 n.187.

disruption have been cited. As with the Iowa cases, most of these authorities from other jurisdictions contain more florid fact patterns than this case.[6]

In the end, the question calls for an exercise of our judgment as to whether, on the totality of the circumstances, the State offered sufficient evidence that a jury could find beyond a reasonable doubt that the defendant's confinement of the victim *substantially* increased the risk of harm, *significantly* lessened the risk of detection, or *significantly* facilitated escape. Phrased somewhat differently, did the evidence of the tossing of the cell phone, the locking of the doors, the covering of the victim's mouth, and any additional confinement associated with movement of the victim from the hallway to the bedroom, all occurring within the enclosed apartment, provide a sufficient basis to allow the jury to regard the case as presenting more than sexual abuse but instead involving the much more serious crime of kidnapping with its substantially harsher penalties?

---

[6]In addition, there are cases in which the locking of a door to keep others *out* has been cited, with mixed results. *See, e.g.*, *Lewis v. State*, 50 So. 3d 86, 88 (Fla. Dist. Ct. App. 2010); *Gray v. State*, 939 So. 2d 1095, 1096–97 (Fla. Dist. Ct. App. 2006) (per curiam); *Irizarry v. State*, 905 So. 2d 160, 167 (Fla. Dist. Ct. App. 2005); *State v. Johnson*, 646 S.E.2d 123, 126–27 (N.C. Ct. App. 2007); *State v. Smith*, No. W2012-00259-CCA-R3-CD, 2013 WL 5938017, at *6, 10 (Tenn. Crim. App. Nov. 4, 2013). More compelling from the State's point of view, however, are cases in which the victim is locked *in*. *See, e.g.*, *People v. Vines*, 251 P.3d 943, 974 (Cal. 2011); *Pitts v. State*, 710 So. 2d 62, 62 (Fla. Dist. Ct. App. 1998) (per curiam); *State v. Lykken*, 484 N.W.2d 869, 878 (S.D. 1992).

There are also cases in which the disruption of telephone communications has been cited. *See, e.g.*, *People v. Zamora*, 803 P.2d 568, 570–71, 576 (Kan. 1990); *People v. Warren*, 578 N.W.2d 692, 696 (Mich. Ct. App. 1998), *reversed in part on other grounds*, 615 N.W.2d 691 (Mich. 2000); *Key*, 636 S.E.2d at 819–21; *Chatman v. Commonwealth*, 739 S.E.2d 245, 251 (Va. Ct. App. 2013). Many of these fact patterns are far more aggravated that the facts of this case.

We conclude that it does not. We note in particular the potential of sliding downhill into situations in which a person with limited additional criminal culpability suffers a dramatically increased penalty. In the words of Yeager and Carlson, the underlying crime must be substantially more heinous to give rise to a kidnapping conviction. Yeager & Carlson at 66. We conclude that this heinous concept underlies the *Rich* tripartite test with its attendant intensifiers. While there might be some marginal increase in the risk of harm, lessening of detention, or facilitation of escape, we conclude it is not sufficient to trigger dramatically increased sanctions under our kidnapping statute in this case.

**D. Disposition.** In light of our disposition of the kidnapping charge, we now consider the disposition of this case. In order to determine the appropriate course on remand, we examine the jury instructions as law of the case in light of our holding on the kidnapping charge. *See State v. Murray*, 796 N.W.2d 907, 910 (Iowa 2011) (noting lesser included offense instruction became law of the case when defendant failed to preserve error by objecting to instruction); *State v. Taggart*, 430 N.W.2d 423, 425 (Iowa 1988) ("Failure to timely object to an instruction not only waives the right to assert error on appeal, but also the instruction, right or wrong, becomes the law of the case." (Citation and internal quotation marks omitted.)).

Because under the instructions, kidnapping in the first degree, kidnapping in the third degree, and false imprisonment all had a common confinement instruction, those charges must be dismissed for lack of sufficient evidence. *See State v. Snider*, 479 N.W.2d 622, 623–24 (Iowa Ct. App. 1991) (noting the confinement element of false

imprisonment is defined by reference to the kidnapping statute and its application as defined by both *Rich* and *Misner*).

With respect to the remaining charges of sexual abuse in the second degree and sexual abuse in the third degree, the instructions told the jury not to consider these offenses independently if it found Robinson guilty of kidnapping. As a result, we do not have a specific jury verdict on the jury verdict form for sexual abuse in the second degree or sexual abuse in the third degree.

Nonetheless, the jury necessarily found that Robinson engaged in sexual abuse in the third degree when it convicted him of kidnapping because under the instructions the jury was required to find Robinson had engaged in an act of sexual abuse to convict him of kidnapping in the first degree. No claim on appeal has been made that the evidence was insufficient to find that Robinson was guilty of sexual abuse in the third degree.

We cannot determine, however, whether the jury found Robinson guilty of sexual abuse in the second degree, which requires an additional finding that during the commission of the sexual abuse, Robinson used or threatened to use force creating a substantial risk of death or serious injury to B.S. *Compare* Iowa Code § 709.3(1) (2011) (sexual abuse in the second degree), *with* Iowa Code § 709.4(1) (sexual abuse in the third degree). This element is not a prerequisite to a kidnaping in the first-degree verdict.

In light of the record, we conclude the State may pursue one of two options in this case on remand. The State has the option of standing on the jury's necessary determination that Robinson was guilty of sexual abuse in the third degree and ask the court to enter judgment on that offense and to sentence Robinson accordingly. In the alternative,

however, the State may on remand elect to retry Robinson on sexual abuse in the second degree, an offense which the jury verdict in this case was not required to decide.

### IV. Barrier-Free Contact with Counsel.

We finally address the question of whether the defendant was improperly denied his statutory or constitutional right to effective assistance of counsel because of the existence of the Plexiglas barrier separating the defendant from his attorney at the Dubuque County Jail. While we have reversed Robinson's conviction on other grounds, we address the question related to access to barrier-free contact between Robinson and his attorney in order to provide the district court and the parties with guidance should the State elect to retry Robinson on remand.

### A. Procedural History.

1. *Robinson's motion.* Prior to trial, Robinson filed a motion for barrier-free contact between counsel and defendant. In order to understand the precise scope of the issues before us, it is necessary to engage in a detailed review of the proceedings below.

We begin with a review of the substance of Robinson's motion. The motion alleged that the visiting rooms at the jail imposed a Plexiglas barrier between Robinson and his counsel, that meetings were video and possibly audio recorded, and that conversations between Robinson and his lawyer could be overheard by persons standing outside the door of the visiting rooms. He contended the physical arrangements at the jail violated Iowa Code section 804.20, which he stated affords arrestees the right to consult with their attorney confidentially and alone and in private. *See State v. Walker*, 804 N.W.2d 284, 289–90 (Iowa 2011). He further contended the barrier and video recording violated his right to

counsel under the Sixth Amendment to the United States Constitution and under article I, section 10 of the Iowa Constitution.

Robinson raised four specific challenges to the arrangement. First, the motion alleged the Plexiglas barrier required the parties to yell in order to be heard and that persons standing outside the room could overhear what was being said. Second, the motion emphasized there was no means for Robinson and his counsel to review documents together other than either hold the documents up against the barrier one at a time or have a jailer convey the documents. Third, the motion alleged there was no means by which Robinson and his lawyer could review video or audio recordings together. Fourth, Robinson stated he believed the rooms were video recorded and that it was unknown whether they were audio recorded. In two of the visiting rooms utilized by the jail, however, the motion alleged that jailers had a clear view of meetings between Robinson and his attorney.

The allegations in Robinson's motion concluded by noting that there had been no showing that Robinson had been violent or disruptive at the jail. In his prayer for relief, Robinson requested an order requiring the Dubuque County Sheriff to provide a "barrier-free room that is free of video and/or audio recording devices and in which the conversations between the undersigned and the Defendant may not be observed."

2. *Hearing before the district court.* The district court held a hearing on the motion. Robinson presented no evidence, but counsel made a statement to the court. The State offered evidence from Thomas Fitzpatrick, a Dubuque County deputy sheriff and assistant jail administrator for the Dubuque County Jail. A CD of photographs of the visiting room facilities was admitted into evidence.

In support of the motion, Robinson's counsel began by advising the court that the staff at the jail were very professional, but all of the visiting rooms have a Plexiglas barrier and none have a pass-through arrangement. Further, counsel asserted he had to yell to communicate with his client. Counsel told the court:

> Because there's no pass-through and because we're literally yelling through a hole in the wall or through another barrier, anyone standing outside of any one of those rooms, either surreptitiously or walking past, can hear the conversation, because both Mr. Robinson and I have to raise our voices. And that's the issue that I have . . . . We're trying to have confidential conversations, and I'm having to talk louder than I'm addressing the Court right now.

With respect to the passing of documents, Robinson's counsel further noted that in one of the meeting rooms there is only a small "metal shelf, maybe 14 to 16 inches long, maybe eight inches wide." Robinson's lawyer argued that the physical arrangement did not allow him to go over documents, noting, "[W]e've got a lot of police reports to go over, things like that."

Robinson's counsel cited *Walker*, 804 N.W.2d at 289–95, for the proposition that he was entitled to barrier-free contact with his counsel under Iowa Code section 804.20 unless the State could show some specific individualized suspicion or a threat to safety or security. Robinson's counsel also cited *People v. Parsons*, 15 P.3d 799, 804–05 (Colo. Ct. App. 2000), for the propositions that there should be a pass-through available, no video camera surveillance should be allowed, and attorneys and clients should be able to converse in a normal tone of voice. Counsel noted the *Parsons* court emphasized this set-up was necessary so that attorney–client meetings "cannot be overheard by those who are outside the room, but who may be in the immediate area." *Id.* at

804. Robinson emphasized he had a clear constitutional right to discuss the case with his attorney in a normal tone of voice, unobserved by other persons.

The State offered the testimony of Thomas Fitzpatrick. Fitzpatrick described the visiting rooms at the Dubuque County Jail. With respect to video surveillance, Fitzpatrick testified there were cameras located outside the door of each visiting room, but when the door was closed, as it ordinarily was in an attorney–client meeting, the video cameras would be shut off from recording activities within the room. Fitzpatrick minimized the sound issues, noting that if someone raised his voice, that might get attention. Fitzpatrick explained that no jail staff is stationed outside the doors of the visiting rooms. Fitzpatrick further testified that while the jail has allowed, on a case-by-case basis, attorneys and their clients to meet in a barrier-free room to go over documents, they have never allowed a barrier-free visiting room "carte blanche." While Fitzpatrick conceded he had no knowledge of Robinson having any discipline issues or issues of violence in the jail, he testified he trusted no one and he would not be able to provide appropriate security for all inmates in every case if barrier-free contact with counsel was the norm.

The State argued there was no need to provide barrier-free contact with counsel absent a specific showing of need. The State distinguished *Walker*, noting in that case there was a very specific need for the attorney to have barrier-free contact and here no such immediate need is present.

In response, Robinson's counsel stated:

He and I need to be able to communicate to prepare for trial.

I agree with [the State] again the cases don't necessarily allow for—that they don't talk about the same contact that Mr. Robinson and I would have sitting here.

Robinson's counsel then made a specific point:

> But there's no pass-through at all. I don't know for sure, but I think that even some sort of pass-through so that he and I can examine documents, examine videos, listen to audio in this case as we prepare his defense is what respects his constitutional right.
>
> . . . .
>
> I think that under the facts of this case, we do need barrier-free contact or at least some way to pass-through so that Mr. Robinson and I can communicate so that his constitutional rights are protected.

3. *Ruling of the district court.* After the hearing and the district court judge's inspection of the jail facilities, the district court entered an order on the motion. As to the facts, the district court found that none of the rooms were monitored through electronic surveillance. The district court further found that "people talking in a normal voice can hear each other through the sound grates [in the visiting rooms], although the sound is somewhat muffled." Further, the district court found that while a guard positioned directly outside the doors would be able to overhear portions of the discussions, no staff are stationed outside the room, but instead are in a control room where they cannot hear anything other than screaming. The court further found, as conceded by the parties, there was no pass-through in any of the visiting rooms.

On legal issues, the district court found that our holding in *Walker*, 804 N.W.2d at 292, an OWI case, was fact-specific in that the attorney needed immediate, barrier-free access to his client in order to smell his breath and have him perform sobriety tests so the attorney could properly advise him as to whether to submit to a breath test. The district court dropped a footnote questioning, but not deciding, whether Iowa Code section 804.20 applied in this case or only related to communications at the time of initial detention. The district court held

that Iowa Code section 804.20 did not require "barrier free access to his attorney for every visit, regardless of purpose."

The district court did note that barrier-free contact may be warranted under Iowa Code section 804.20 "for specific purposes such as those cited by defense counsel—i.e. physical demonstrations and reviewing audio and video recordings together." The district court ordered that if those situations were to arise, Robinson would be entitled to barrier-free accommodations, and if the jail refused, Robinson could file a motion with the court outlining the need for such accommodation. At that point, the burden would shift to the State to make a showing of "case-specific, individualized suspicion in order to prohibit barrier-free contact."

The district court recognized that Robinson had raised constitutional as well as statutory claims. With respect to constitutional claims, the district court held that barrier-free access to counsel "to this point" had not violated Robinson's right to counsel under the United States or Iowa Constitutions.

The district court order thus established a framework under which Robinson could seek barrier-free contact with his counsel upon a showing of specific needs as asserted by his lawyer in his motion and at the hearing, but denied barrier-free contact "for every meeting, regardless of purpose."

**B. Positions of the Parties on Appeal.** On appeal, Robinson's counsel reviews the evidentiary record establishing that the visiting rooms have a Plexiglas barrier and no pass-through for documents. His appellate brief summarizes the conflicting views regarding whether an attorney has to yell to communicate with a client in the visiting rooms. The appellate brief also surveys the evidence regarding security cameras

located in the hallways and the intercom system that allows staff in the control room to communicate with lawyers in the visiting room.

Robinson does not, however, directly challenge the factual findings of the district court. Robinson does not claim, for instance, that the district court erred in finding that an attorney could communicate with his client in the visiting rooms in a normal tone of voice, although the sound was somewhat muffled. Robinson further did not challenge the factual finding that although a jail staff standing directly outside the door might overhear portions of a conversation, jail staff were assigned to the control room and were not stationed in a position to overhear attorney–client conversations. Finally, on appeal Robinson did not challenge the assertion that there was no video surveillance of the rooms when the doors were closed. As a result, on appeal, we do not question the undisputed fact-finding of the district court.

Robinson raises two theories on appeal. First, Robinson relies on *Walker* for the proposition that under Iowa Code section 804.20 and under the right-to-counsel provisions of the Iowa and United States Constitutions, a lawyer is always entitled to barrier-free access with his or her client absent an individualized showing of a threat of violence or a threat to institutional security. Second, Robinson argues that barrier-free contact with counsel is necessary to allow the attorney and the accused to develop a relationship of trust and confidence.

The State contends on appeal, among other things, that Iowa Code section 804.20 is not implicated in this case, as it applies only to situations in which a defendant is in custody but has not yet been charged with a crime. More narrowly, the State asserts that even if section 804.20 applies, under *Walker* there must be a specific showing of need in order for the defendant to be entitled to barrier-free contact with

counsel. On the constitutional issues, the State argues that caselaw subsequent to the federal cases cited in *Walker* indicate there is no "carte blanche" right to barrier-free contact with counsel. Finally, the State generally argues that before we reverse a criminal conviction on grounds of lack of barrier-free contact with counsel, the defendant must show that he or she has been prejudiced by the denial of his or her right to counsel. According to the State, Robinson simply cannot make that showing.

**C. Analysis.** On appeal, Robinson argues that he has a broad right to barrier-free contact with counsel under Iowa Code section 804.20. We do not agree. While there is language in Iowa Code section 804.20 that seems to suggest a broad application ("any person arrested or restrained of the person's liberty for any reason whatever"), the statute also emphasizes that the right to call family or consult counsel should occur "without unnecessary delay after arrival at the place of detention." Further, the statute must be interpreted in context. *See Andover Volunteer Fire Dep't v. Grinnell Mut. Reins. Co.*, 787 N.W.2d 75, 82 (Iowa 2010) (noting the "context of a statute is an important consideration in the search for legislative intent"). Iowa Code chapter 804 generally deals with the commencement of criminal actions and arrests. The chapter contains a wide array of provisions dealing with arrests, including arrest by warrant, arrest by peace officers, arrest by federal law enforcement officers, arrests by out-of-state peace officers, etc. *See* Iowa Code §§ 804.1, .7, .7A, .7B. The title of Iowa Code section 804.20 is "Communications by arrested persons." The next provision deals with initial appearances before a magistrate. *See id.* § 804.21. In context, we conclude Iowa Code section 804.20 applies to the period after arrest but

prior to the formal commencement of criminal charges. As a result, Robinson is not entitled to any relief on this statutory ground.

That leaves Robinson's constitutional claim on appeal, namely that barrier-free contact with counsel is required in order to ensure a "relationship and a level of trust and comfort." *See Adams v. Carlson*, 488 F.2d 619, 630 (7th Cir. 1973) (noting the difficulty of attorneys and clients establishing a relationship "behind glass"). This claim, however, was not made before the district court. Instead, as seen above, at the district court Robinson focused on issues upon which he either prevailed before the district court (namely, the right to barrier-free contact with counsel to review documents or review video or audio recordings) or which have not been raised on appeal (video surveillance, overhearing attorney–client conferences through audio or other means). In short, Robinson largely prevailed on the issues presented below and did not raise the trust-and-comfort issue now asserted on appeal.

As a result, we conclude Robinson has not preserved any claim under the United States or Iowa Constitutions that he is entitled to barrier-free contact with his attorney in order to develop a relationship of trust and comfort. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Because the issue raised by Robinson in this appeal has not been preserved, he is not entitled to relief.

### V. Conclusion.

For the above reasons, the decision of the court of appeals is vacated in part and the judgment of the district court is reversed and the case remanded for proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Wiggins, J., who concurs specially.

#12–1323, *State v. Robinson*

**WIGGINS, Justice (concurring specially).**

I concur wholeheartedly with the majority opinion. I write separately because the district court's confinement instruction constituted reversible error. Jury instruction number 23 on confinement provided in relevant part:

> No minimum time of confinement or distance of removal is required. It must be more than slight. The confinement must have significance apart from the sexual abuse.
>
> In determining whether confinement exists, you may consider whether:
>
> 1. The risk of harm to [B.S.] was increased.
>
> 2. The risk of detection was reduced.
>
> 3. Escape was made easier.[7]

The defendant's counsel did not object to the instruction at trial.

The defendant in his pro se brief contends, among other things, he received ineffective assistance of counsel because his counsel did not object to the instruction that failed to include the intensifiers for the three factors mentioned in *State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981). Although the defendant's pro se brief does not mention whether he is proceeding under the Iowa or the United States Constitution, I consider both claims preserved under the circumstances.[8]

The defendant asserts although the jury instruction required the jury to find the confinement in the case had significance beyond the

---

[7]Jury instruction number 23 was adopted from Iowa State Bar Association (ISBA), Iowa Criminal Jury Instruction 1000.5 (2012).

[8]The proper treatment of such claims is discussed in *State v. Halverson*, 857 N.W.2d 632, 635 (Iowa 2015).

underlying sexual assault, the three-factor *Rich* test was included without its intensifiers. Specifically, in order to support a kidnapping conviction, the confinement must "*substantially* increase[] the risk of harm . . . , *significantly* lessen[] the risk of detection, or *significantly* facilitate[] escape." *Id.* at 745 (emphasis added). By failing to include this language, the defendant argues, a jury could conclude the requirement that confinement be significant beyond the underlying sexual assault is supported by any increase in the risk of harm, lessening of the risk of detection, or facilitation of escape, however slight.

## I. Iowa Precedents.

We have never approved the instruction given in this case. In *State v. Hardin,* the jury instruction stated:

> "One of the essential elements which the State is required to prove beyond a reasonable doubt in either kidnapping in the first degree or kidnapping in the third degree or false imprisonment is that [the victim] was confined or removed.
>
> In that regard, you are instructed that this requires more than confinement or removal that is inherent within the commission of the offense of sexual abuse.
>
> A person is 'confined' when that person's freedom to move about is substantially restricted by force, threat, or deception. The person may be confined either in the place where the restriction commences or in a place to which the person has been removed.
>
> Although no minimal period of confinement or distance of removal is required, such must exceed that which is normally incidental or dependent upon the commission of a sexual abuse and must be more than slight, inconsequential, or as an incident inherent in the offense of sexual abuse so that the confinement or removal has a significance separate and apart from a sexual abuse.
>
> Such confinement or removal may exist because it substantially increases the risk of harm to the victim or significantly lessens the risk of detection."

359 N.W.2d 185, 189–90 (Iowa 1984) (alteration in original). The instruction generally conformed to the *Rich* tripartite test. *See id.*

In *State v. Doughty,* we quoted at length from *Rich,* concluding an instruction that did not outline the *Rich* tripartite test was flawed and required a new trial under the circumstances. 359 N.W.2d 439, 440–42 (Iowa 1984). We noted that the instruction failed to indicate "the removal or confinement necessary for first-degree kidnapping." *Id.* at 441.

Our next case involving proper instructions in the context of a kidnapping charge when there was an underlying felony was *State v. Misner,* 410 N.W.2d 216, 221–22 (Iowa 1987). In *Misner,* we stated that *Rich* "delineated the standards by which a jury could determine whether the evidence demonstrated a confinement or removal sufficient to support a charge of kidnapping." *Id.* at 222.

We then declared the standards by which a jury could determine whether the evidence supported a kidnapping charge:

> 1. No minimum period of confinement or distance of removal is required for conviction of kidnapping.
>
> 2. The period of confinement or distance of removal must exceed what is normally incidental to the commission of sexual abuse.
>
> 3. The confinement or removal must have significance independent from the act of sexual abuse itself in one of the following ways:
>
> a. Substantially increase the risk of harm to the victim.
>
> b. Significantly lessen the risk of detection.
>
> c. Significantly facilitate escape following the consummation of the sex abuse offense.

*Id.* We reaffirmed that "[t]hese standards are unquestionably the law in Iowa today with respect to cases involving a kidnapping charge generated out of a sexual abuse charge." *Id.*

In *State v. Hatter,* we laid out in detail the instruction given by the district court. 414 N.W.2d 333, 336 (Iowa 1987). It provided:

> "One of the essential elements of Kidnapping which the State must prove beyond a reasonable doubt is that (the victim) was confined or removed or both. This requires more than the confinement or removal that is inherent within the commission of the offense of sexual abuse, as it is alleged to have occurred in this case.
>
> Although no minimal period of confinement or distance of removal is required, it must exceed that which is incidental or dependent upon the commission of any sexual abuse and must be more than slight, inconsequential or as an incident inherent to any sexual abuse so that the confinement or removal or both has a significance separate and apart from any sexual abuse.
>
> Such confinement or removal or both may exist because it substantially increases the risk of harm to the victim or significantly lessens the risk of detection or significantly facilitates escape. However, it is for you, the jury, after a full and impartial consideration of the evidence admitted during the trial, to determine whether there is confinement or removal or both as defined herein."

*Id.*

Finally, in *State v. McGrew,* we stated, "[A] jury question was presented on whether this type of confinement significantly increased [the victim's] risk of further harm." 515 N.W.2d 36, 40 (Iowa 1994). We further noted "a rational factfinder could find that the risk of detection of the sexual abuse crime was significantly lessened as well as that the risk of harm was substantially increased." *Id.* Clearly, the fact issue for the jury in *McGrew* was whether the evidence met the *Rich* tripartite test. *See id.*

The Iowa Court of Appeals, however, declined to reverse a kidnapping conviction when the Iowa State Bar Association (ISBA) kidnapping instruction was given in *State v. Ripperger*, 514 N.W.2d 740, 750–51 (Iowa Ct. App. 1994). In that case, the court of appeals simply stated the "instruction appropriately conveyed the law," and the court was reluctant to disapprove " 'Uniform Instructions.' " *Id.* (quoting *State v. Doss*, 355 N.W.2d 874, 881 (Iowa 1984)).

We do not preapprove or give a presumption of correctness to the instructions published by the ISBA. I understand the ISBA committee appointed to formulate these instructions is industrious and does its best to get the law right. However, we can never delegate the formulation of the law to the instruction committee. This is not only my view, but also a view held by the United States Court of Appeals for the Eighth Circuit. *See United States v. Jones*, 23 F.3d 1407, 1409 (8th Cir. 1994) (explaining the Eighth Circuit's model instructions are suggestions not binding on lower courts); *United States v. Norton*, 846 F.2d 521, 525 (8th Cir. 1988) (same); *United States v. Ridinger*, 805 F.2d 818, 821 (8th Cir. 1986) (same).

Typically district courts in the Eighth Circuit derive their criminal jury instructions from the Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit. *See generally* Judicial Comm. on Model Jury Instructions for the Eighth Circuit, Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit (2014). The committee prepares the instructions. *See id.* The process in the Eighth Circuit is similar to the process in Iowa.

Commenting on these instructions in one opinion, the Eighth Circuit has taken the view that it has not preapproved these instructions and it needs to look at the instructions on a case-by-case basis.

*Ridinger*, 805 F.2d at 821.  In another opinion, the Eighth Circuit aptly noted "[t]he Model Instructions, . . . are not binding on the district courts of this circuit, but are merely helpful suggestions to assist the district courts."  *Norton*, 846 F.2d at 525.  The Eighth Circuit reaffirmed this view in *Jones*, 23 F.3d at 1409.

Accordingly, we are required to scrutinize the ISBA's instructions and will not hesitate to disapprove faulty jury instructions.  *See, e.g.*, *State v. Beets*, 528 N.W.2d 521, 523 (Iowa 1995) (finding a uniform instruction regarding the offense of assault with intent to commit sexual abuse was not a correct statement of the law); *State v. McKettrick*, 480 N.W.2d 52, 58 (Iowa 1992) (concluding uniform criminal jury instructions did not correctly state elements of assault causing bodily injury); *State v. Deanda*, 218 N.W.2d 649, 650–51 (Iowa 1974) (holding uniform instruction given on entrapment was erroneous as, among other things, it "ignore[d] the factual evaluation to be undertaken on a case by case basis" and "fail[ed] to focus on the crucial question" involved in the case), *overruled on other grounds by State v. Monroe*, 236 N.W.2d 24, 33 (Iowa 1975).

The jury instruction given in this case is inconsistent with our holding in this case—that the defendant's confinement of the victim must have *substantially* increased the risk of harm, *significantly* lessened the risk of detection, or *significantly* facilitated the risk of escape.  Thus, the instruction as given unduly waters down our approach to kidnapping when there is an underlying criminal offense.

Although the instruction accurately indicates the confinement must be significant apart from the sexual abuse, it does not clearly state the *Rich* tripartite test.  The risk of harm beyond sexual abuse must be substantial, and the decreased risk of detection or facilitation of escape

must be significant in order to support a kidnapping conviction. The purpose of these intensifiers is to prevent the swallowing up of the crime of sexual abuse by the much more serious crime of kidnapping. *Compare* Iowa Code § 709.3(2) (2011) (defining second-degree sexual abuse), *and id.* §§ 902.9(1)(*b*), .12(3) (explaining second-degree sexual abuse carries a maximum sentence of no more than twenty-five years, with a seventy percent mandatory minimum), *with id.* § 902.1(1) (explaining first-degree kidnapping is a class "A" felony, carrying with it a sentence of life imprisonment).

As indicated above, virtually all of our kidnapping cases have included these important words, describing the proper standard in evaluating the evidence in kidnapping cases involving underlying crimes. *See, e.g.*, *Hatter*, 414 N.W.2d at 335–36; *Misner*, 410 N.W.2d at 222; *Hardin*, 359 N.W.2d at 190 ("We reaffirm the holding and language of *Rich*."); *see also, e.g.*, *Holmes v. State*, 775 N.W.2d 733, 736–37 (Iowa Ct. App. 2009) (stating the *Rich* tripartite test); *State v. Ledezma*, 549 N.W.2d 307, 311 (Iowa Ct. App. 1996) (same); *cf. State v. Griffin*, 564 N.W.2d 370, 373 (Iowa 1997) (reiterating the policy behind the incidental rule and noting the "legislature did not intend to afford prosecutors the option of bootstrapping convictions for kidnapping, carrying life sentences, onto charges for crimes for which the legislature provides much less severe penalties" (internal quotation marks omitted)).

Under the instruction given by the court in this case, however, a jury could have concluded a relatively slight increase in the risk of harm or relatively slight decrease in the risk of detection or ease of escape was sufficient to support a kidnapping conviction. *Cf. Doughty*, 359 N.W.2d at 441 (noting that "[w]hile the jury could well have found that the removal and confinement were not merely incident to the sexual abuse,

we cannot say it would be compelled to reach that conclusion" based on a faulty jury instruction that did not incorporate the *Rich* tripartite test). Thus, I think the instruction in the present case, if not inaccurate, was at least confusing. *See Burkhalter v. Burkhalter*, 841 N.W.2d 93, 97 (Iowa 2013) ("When the challenged instruction is conflicting and confusing, error is presumed prejudicial and reversal is required." (Internal quotation marks omitted.)); *see also Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1110 (Colo. 1982) (en banc) (noting "even accurate statements of the law should not be used in jury instructions if they are misleading" and "it is error to include statements of the law without instructing the jury on how to apply them"). Confusing instructions are especially problematic in a factually close case, as is the situation here. *See People v. James*, 241 Cal. Rptr. 691, 700–01 (Ct. App. 1987) (finding a confusing instruction harmless and noting it was "significant this [was] not a close case"); *Preston v. State*, 647 S.E.2d 260, 263 (Ga. 2007) (noting a particular instruction should not be given in the future, as it "could have the possibility of being confusing in a close case"); *see also United States v. Wisecarver*, 598 F.3d 982, 989–90 (8th Cir. 2010) (holding confusing jury instruction given in a close case seriously affected the fairness and integrity of the trial); *United States v. Easley*, 942 F.2d 405, 411–12 (6th Cir. 1991) (reversing and remanding for a new trial in a close case because the district court erred by giving an instruction that had the possibility of causing considerable jury confusion).

## II. Ineffective Assistance Analysis.

The pro se defendant does not suggest an approach to evaluating effectiveness of counsel other than that announced in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674,

693 (1984), and I therefore apply that standard in this case. On the first prong, I think competent counsel should have recognized the instruction missed an important part of our law regarding kidnapping. *See id.* Even a cursory review of our caselaw would have revealed we repeatedly emphasized the risk of harm must be substantial and the lessened detection and ease of escape must be significant. Read in the full context of our cases, the court of appeals decision in *Ripperger* is doubtful precedent, particularly in light of *McGrew*, an Iowa Supreme Court case decided the same year which relied heavily upon *Rich*. *See McGrew*, 515 N.W.2d at 39 (citing the *Rich* tripartite test, and noting that since *Rich* we have adhered to its analysis regarding application of the incidental rule); *Ripperger*, 514 N.W.2d at 750–51.

I think it is apparent that a challenge to the instruction, particularly in a case where the evidence supporting confinement in excess of that incidental to sexual abuse was thin, a challenge to a jury instruction as not conforming with *Rich* and its clear progeny applying the tripartite test was a claim worth raising. *See State v. Schoelerman*, 315 N.W.2d 67, 72 (Iowa 1982) (finding nothing would have stopped an attorney from raising an issue if the attorney would have consulted the law in other jurisdictions when none existed in Iowa); *see also State v. Ross*, 845 N.W.2d 692, 698 (Iowa 2014) (recognizing failure to preserve error by objecting to an inaccurate jury instruction breaches an attorney's duty); *State v. Ondayog*, 722 N.W.2d 778, 785 (Iowa 2006) ("[F]ailure to recognize an erroneous [jury] instruction and preserve error breaches an essential duty."). We have cited, with approval, a treatise that declares that in order to be effective, counsel must "diligently devote[] him or herself to scholarly study of the governing legal principles." *State v. Vance*, 790 N.W.2d 775, 786 (Iowa 2010) (internal

quotation marks omitted).    Such a study would have revealed the inconsistency between the approved instruction in *Ripperger* and our caselaw.

I further conclude the faulty instruction prejudiced the defendant. Our precedents emphasize that while in some cases the evidence clearly establishes the prerequisites for kidnapping independent of the underlying crimes and in others, the evidence is clearly lacking, the cases in the middle category between these extremes are cases for the jury to decide.  In making the necessary determination, it is axiomatic the court properly instruct the jury.  In a factually close case such as this, the failure of the district court to give a completely accurate instruction under the *Rich* tripartite test undermines my confidence in the verdict.

Further, I think trial courts should reformulate the ISBA's instruction to conform with the holding in this case and include the concept that the defendant's confinement of the victim *substantially* increased the risk of harm, *significantly* lessened the risk of detection, or *significantly* facilitated the risk of escape to avoid reversible error.