**IN THE COURT OF APPEALS OF IOWA**

No. 14-1932
Filed June 15, 2016

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**DEBRA DENISE OLIVER,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano,

Judge.

A defendant appeals her convictions for kidnapping in the first degree,

attempted murder, and willful injury. **AFFIRMED.**

David Barajas of Gaudineer & George, L.L.P., West Des Moines, for

appellant.

Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant

Attorney General, for appellee.

Heard by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

Ronald Carris dialed 911 from inside the trunk of his own car, whispering his license plate number to the dispatcher so police could intercept his kidnappers. Carris was able to identify "Deb" as one of his captors. The phone line remained open while Carris suffered multiple blows from a brick. By the time the police tracked the phone to Prospect Park, Carris was bleeding heavily and gasping for breath. The officers apprehended Debra Oliver at the scene. A jury found Oliver guilty of first-degree kidnapping, attempt to commit murder, and willful injury.

On appeal, Oliver argues the State failed to offer sufficient evidence of her guilt.[1] Oliver foists blame on co-defendant John Deering, contending he forced her to drive Carris's car to the park. She also claims she did not assault Carris. Finding sufficient evidence to support the jury verdicts, we affirm her convictions.

## I.    Prior Facts and Proceedings

> They threw me in the back of the trunk . . . .   It's Deb . . . .
> It's a black Impala . . . .   They're out here, I can't talk right now . . . .
> [Dispatcher:] Who did this to you?  [Carris:] Deb, Deb[2] . . . .   I can't
> get away, they're right here . . . .   I've been in here about fifteen,
> twenty minutes.  Could you GPS me?

So began Carris's desperate call for help in the early morning hours of April 11, 2014. He told the dispatcher the name of the female kidnapper, Deb, but he did

---

[1] At oral argument, Oliver's attorney withdrew her challenge regarding Oliver's statements to police *after* waiving her *Miranda* rights and *before* asking for an attorney. Additionally, Oliver asks us to preserve for possible postconviction proceedings a claim trial counsel was ineffective in not obtaining records regarding Carris's stepdaughter, who testified regarding his debilitated condition. The State agrees this claim is "better addressed" in postconviction proceedings. Accordingly, we preserve this claim.

[2] Carris identified the kidnapper as Deb Jordan. The record does not reveal why Carris referred to her by the last name of Jordan rather than Oliver.

not know the name of her male confederate, later determined to be John Deering. Carris also told the dispatcher he remembered leaving from Sixth Avenue. The dispatcher asked Carris: "Who is Deb to you"? Carris replied, "Just a friend. No, not really a friend."

After about four minutes, the kidnappers removed Carris from the trunk while unbeknownst to them the 911 recording continued. One kidnapper told the other, "Get the brick." Sixty-year-old Carris pleaded: "Come on. Will you stop? Don't . . . . I'm not going to tell anything . . . . Come on, just let me go. I'm not going to tell nothing."

After five minutes, Deering said: "He's out. He's out. He's going to sleep." Oliver replied: "No, he's not . . . no, he's not."[3] Deering then said: "Drop it on his head . . . throw it on his head." One of the kidnappers then repeated: "Get the brick. Get the brick. After six minutes, Deering implored: "Enough Deb, he's out." Listening to the mayhem, the dispatcher exclaimed: "Oh, they're hitting him." At that point the predominant sound on the recording was the victim's grossly abnormal breathing. After seven minutes, Oliver said: "Come on it's late."

After nine minutes, Deering urged: "Get my coat."[4] One of the kidnappers excitedly repeated: "Drag him. Drag him by the leg. He's got a fake leg, just drag him . . . . Grab a leg. Grab, grab, grab somewhere . . . . Okay, you ready?" After ten minutes, Deering said: "Come on, Deb." The call was then disconnected.

---

[3] A reasonable jury listening to the 911 call at trial could find from the overall circumstances that the male voice was Deering and the female voice was Oliver. Accordingly, we use their names when describing the call.
[4] This directive apparently was not carried out—as the police would later discover a black leather jacket containing Deering's Iowa identification card left in Carris's Impala.

Dispatch eventually located Carris's phone signal coming from Prospect Park. Upon first arriving at the park, the police saw the Impala's rear passenger window was smashed. Outside the car, the police found a large pool of blood, an empty wallet, and drag marks from the pool of blood toward a nearby wooded area. On the ground at the edge of the woods, an officer located Carris, who was "injured severely" and taking slow, deep breaths. Seeing his concave skull fracture, paramedics rushed Carris to the hospital, where doctors kept him alive. But Carris suffered irreversible brain damage and, at the time of trial, required round-the-clock nursing care.

A short distance from where Carris lay, the police found Oliver quietly lying face down and took her into custody. The police did not locate a second suspect in the park. While Oliver was sitting on the curb in handcuffs, she told an officer she had been with John Deering. Oliver did not tell the officer she had been threatened by Deering. Oliver had a cell phone with her.

Investigators found a right-handed black glove at the scene and later tested it for DNA. The DNA profile of the blood on the outside palm of the glove matched Carris, while Deering's DNA was discovered inside the glove. Investigators also found a brick, which looked to be soaked with blood, and the scattered parts of two cell phones, one of which was later determined to belong to Carris.

Police transported Oliver to the police station, where she waived her *Miranda* rights and answered detectives' questions. When she did so, Oliver did not know Carris had called 911 and his beating had been captured in an audio recording. After giving one address as her residence, Oliver later acknowledged

she had been with Carris "all week" and had "some bags at his house." Oliver complained her throat was sore "from when [Deering] grabbed me around the neck."

Oliver said she had been driving Carris's car all weekend, and she provided a rambling explanation of the evening's events. Oliver told the detectives she and Carris picked up her friend Cameo Harris, and they drove around looking for crack cocaine and alcohol. After purchasing vodka, "then we take [Harris] to McDonald's on 6th Avenue, and this is where we run into Mr. John Deering. Well, he's very abusive, he grabs me by the throat, for no reason though." Oliver said this "first incident" occurred when she was outside the car and Deering grabbed her by the neck.

Later in the interview, Oliver said they saw Deering and Earl Carmichael outside McDonald's, Carmichael got into the car, and she drove around with Carris, Carmichael, and Harris for a couple of hours. Eventually, Oliver returned to McDonald's "and that's when John Deering starts acting a damn fool." At some point, Oliver dropped off Harris, and then Carmichael, and once again only Oliver and Carris were in Carris's car.

According to Oliver, she then stopped to talk to someone on Indianola Road, and Deering "comes out of nowhere." Oliver drove to the corner, "all of a sudden, bam, on one side, and then, bam, on the other side." Oliver said Deering threw a brick through the passenger rear window and "jumped through the window" into the backseat. Later in the interview, Oliver hedged her statement of Deering throwing a "brick": "I never actually saw the brick but I know it was a brick, OK. Well, I can't say I know it was a brick. But, actually, I thought

it was a rock . . . . So, when the officers got there, I said: "Look for a brick, look for a brick." No officer testified to Oliver making that statement at the crime scene.

Oliver told the detectives she saw Deering putting on gloves after he entered the car through the broken window. At one point, Oliver said Deering threatened to "kill us" and eventually told her to drive to Prospect Park. Oliver also said Deering asked her if she wanted him to kill Carris and Oliver told him no. Oliver explained, Deering "jumps through the window and does all this, and grabs me by the neck and it was just crazy after that." Further, Deering is "telling us both to shut up, grabs me by my neck." The trio arrived at the park. Oliver stated: "[T]he officer said something about the trunk, I don't know. [Deering] tells me, 'Get down. Get to the weeds, lay down.' OK. I pulled the keys . . . I was lying down, that's all I know."

When the officers again asked if Carris was ever in the trunk, Oliver replied: "Not that I know of. Not that I know of. Unless I wasn't with him, I was, [Deering] had told me to get down in the weeds." Oliver stated because she was lying face down, she did not see Carris get out of the car or see Deering assault Carris. A detective then said, "That looks like little spots of blood on your shirt." Oliver replied, "Well, I was in the weeds." Criminologists later determined Carris's spattered blood was on the front of Oliver's shirt and pants.

When the detectives asked Oliver to again explain the events at the park, she responded, "OK, maybe I need an attorney." After a suppression hearing, the court excluded all statements made after her invocation of counsel under

Iowa Code section 804.20 (2013). The court also suppressed all statements made after Oliver stated she did not want to talk "right now."

The State charged Deering and Oliver in a joint trial information, but the district court granted Deering's motion to sever. During Oliver's jury trial in October 2014, State witness Cameo Harris testified she had known Oliver and Deering since childhood and had known Carris for around ten years. Harris said Oliver referred to Carris as her roommate. According to Harris, shortly before 2:00 a.m. on April 11, she, Oliver, and Carris went out in search of alcohol. Oliver drove, Harris was in the front seat, and Carris was in the back seat. As they drove by the McDonald's at Sixth Avenue and University, Deering and Earl Carmichael flagged them down and got in the back of the car with Carris. When the group arrived at the QuikTrip by McDonald's too late to buy alcohol, they drove to a house to buy drugs. During the trip, Harris observed Deering was "in kind of a happy mood, but he was like moving really fast and [Oliver] kept telling him, okay, calm down, be quiet."

When Harris entered the house to buy drugs, Oliver and Deering also exited the car. Harris saw them arguing "face-to-face." Carmichael was quiet and remained in the car. Harris testified Oliver "wasn't scared but I was scared for her." According to Harris, Deering was aggressive toward both her and Oliver. As Harris returned to the car, she saw Oliver "protecting" Carris by not letting Deering get back in the car and by telling Carris to get in the front seat. Harris said Oliver held Deering "by his shirt. She was bigger than [Deering,] and [Deering] was talking, and [Oliver] wasn't going to let him put his hands on her." Harris testified Oliver drove away from the drug house without Deering and then

dropped Harris off. When Oliver drove away with Carmichael and Carris, Carris was not injured, and the car was not damaged.

On cross-examination Harris recalled saying in an earlier interview that Deering was "kind of scared" when Oliver grabbed his shirt. Harris also admitted she did not say Oliver was trying to "protect" Carris during her earlier interview or her deposition. Harris then contended, "I just gave more detail this time."

According to Oliver's statements to police, after Harris left the car, Oliver dropped off Carmichael. Oliver and Carris continued to drive around. While several hours thereafter are unaccounted for, both Oliver's statements to the police and Carris's 911 call show Deering reunited with Oliver and Carris at some point in the early morning hours.

During closing argument, Oliver's counsel argued the State did not prove kidnapping because the evidence did not show Oliver removed Carris from one place to another with the specific intent to do him harm or to try to conceal him. As to attempted murder, counsel asserted the evidence did not show Oliver participated in the brutal beating of Carris and did not show Oliver knew Deering intended to kill Carris—"She had to know that. Just being there isn't enough." On the willful injury charge, counsel again pointed to Deering:

> [Y]ou have to find that [Oliver] knew what Mr. Deering was going to do because all of the evidence in this case is that Mr. Deering is the one running the show, he is the one that beat Ronald Carris, [Deering has] all of the DNA evidence at the scene . . . . Not just that she was there. She was there. She told [the officer] John Deering . . . . [Oliver] is what she said she was, a person in the car when John Deering broke that window in and forced his way in and acted upon.

The jury found Oliver guilty beyond a reasonable doubt on all three counts, and she appeals her convictions.

## II. Scope and Standards of Review

We review challenges to the sufficiency of the evidence for correction of legal error. *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). In assessing the jury's finding of guilt, we view the evidence in a light most favorable to the State. *Id.* We are bound by the finding of guilt unless it is not supported by substantial evidence. *Id.* Evidence is substantial if it would convince a rational trier of fact Oliver is guilty beyond a reasonable doubt. *See id.*

## III. Sufficiency of the Evidence

On appeal, Oliver claims the State's evidence "did not sufficiently show that she participated or aided anyone in the commission of the crimes." She also asserts the State failed to present a "theory as to the motive for the crimes."

As a starting point, we recognize motive is not an element of these crimes and its proof is not essential to our sustaining Oliver's convictions. *See State v. Knox*, 18 N.W.2d 716, 724 (Iowa 1945). But even so, we find substantial evidence in the record for a rational fact finder to conclude Carris's kidnappers planned to rob him. The kidnappers were driving Carris's car, threw him in the trunk against his will, and investigators found Carris's empty wallet and cell phone on the ground at the crime scene. From this evidence, it was reasonable for the jury to infer robbery as a motive for the crimes. *See State v. Parkey*, 471 N.W.2d 896, 897 (Iowa Ct. App. 1991) (stating trier of fact is allowed to make legitimate inferences from the evidence in the record).

Beyond the robbery motive, we find ample evidence in the record to support her convictions for actively participating or aiding and abetting in the crimes. First, the jury heard the audio recording of Carris's chilling 911 call. The male kidnapper, later determined to be Deering, repeatedly refers to the female kidnapper by the name "Deb" and can be heard saying during the beating: "Enough, Deb, he's out." More than seven minutes into the call, Oliver can be heard saying, "Come on, it's late." Their audible conversation belies Oliver's statements to police that she was passively lying in the grass at the park. The jury also could have inferred from the recording that Deering and Oliver acted together to drag Carris's body towards the woods where police found Oliver.

Second, unaware of the 911 call, Oliver told police Carris was not in the trunk and she did not see an assault or hear a fight. The 911 call shows the falsity of Oliver's statements. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) ("A false story told by a defendant to explain or deny a material fact . . . is by itself an indication of guilt . . . [and shows] the defendant fabricated evidence.").

Third, the verdict is supported by the fact Carris's blood was splattered on the front of Oliver's shirt and pants. The jury was entitled to discredit Oliver's interview statement that his blood was on her clothing because she was "in the weeds." *See State v. Mitchell*, 568 N.W.2d 493, 503-04 (Iowa 1997) (stating the credibility of witnesses is generally left to the jury, "allowing it to resolve inconsistencies as it sees fit").

As the judges of credibility, the jurors also were free to reject Oliver's assertions to police that she feared Deering. Harris testified it was Deering who was afraid of Oliver after she grabbed his shirt earlier in the evening. Oliver also

made inconsistent statements about Deering strangling her. Originally, she said he placed his hands around her throat at McDonald's. Later in the interview, she said Deering grabbed her throat after he broke out the car's window on Indianola Road. An officer testified Oliver had no injuries to her throat at the time of the interview.

When viewed in the light most favorable to the jury's verdicts, including all reasonable inferences that may be deduced from the evidence, we determine substantial evidence existed to find Oliver guilty beyond a reasonable doubt on all three counts. *See State v. Adams*, 554 N.W.2d 686, 692 (Iowa 1996) (stating "proof of intent usually consists of circumstantial evidence and the inferences that can be drawn from that evidence").

**AFFIRMED.**