# IN THE COURT OF APPEALS OF IOWA

No. 18-1465
Filed April 29, 2020

**BRIAN KONCEL,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Jackson County, Kevin McKeever,

Judge.

Brian Koncel appeals the district court's denial of his application for

postconviction relief. **AFFIRMED.**

Mark C. Meyer, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney

General, for appellee State.

Considered by Bower, C.J., and Vaitheswaran and Doyle, JJ.

**VAITHESWARAN, Judge.**

Brian Koncel appeals the district court's denial of his application for postconviction relief (PCR) following his 1997 conviction for first-degree kidnapping. He challenges the court's denial of several ineffective-assistance-of-counsel claims.

## I. *Background Facts and Proceedings*

This court summarized the pertinent facts in *State v. Koncel*, No. 98-0169, 2001 WL 98611, at *1 (Iowa Ct. App. Feb. 7, 2001).

> When Marty Budde and a friend drove by his parents' farm which was rented by Brian Koncel's mother they noticed lights on in an out-building. After dropping his friend off, Budde returned to the farm. The next morning Budde's wife reported him missing. The search led to the farm where a large amount of blood was found. The officers searched the farm area and asked Brian's brother Joseph for permission to search the house where they found a crowbar behind the stove, a knife behind the sofa, and wet clothing in the bathtub. Budde's truck and body eventually were located in a wooded area eight miles from the farm.
>
> During questioning, Brian Koncel told the police he heard a noise and went outside to find Joseph hitting someone with a crowbar. Brian said he helped Joseph load Budde in the back of his truck and they drove to a secluded area where Joseph pulled Budde into the surrounding woods. A short time later Joseph came back and said Budde was not dead. Joseph returned to the woods holding a knife and came back a short time later. The state charged Brian with felony murder in violation of Iowa Code sections 707.1 and 707.2(2) and first-degree kidnapping in violation of Iowa Code sections 710.1(4) and 710.2 (1997).
>
> . . . .
>
> At trial the former state medical examiner testified the blows received at the farm, if untreated, would have resulted in death within about thirty minutes. He also opined, given the amount of blood found in the truck, that Budde was still alive when he was moved. He testified that the small amount of bruising near the knife wounds indicated they were received shortly before death. The marshalling instruction for first-degree murder said in part that the State needed to prove "the defendant *or Joseph Koncel* struck Marty Lee Budde." (Emphasis added). The jury found Brian Koncel guilty of first-degree

kidnapping and first-degree felony murder. The court sentenced him to concurrent life sentences.

*Koncel*, 2001 WL 98611, at *1. We set aside Koncel's first-degree murder conviction based on instructional error. *Id*. at *3–4. We affirmed his conviction for first-degree kidnapping. *Id*. at *3.

Koncel's PCR application was filed in 2004 but was not heard and considered until 2018.

## II. Ineffective Assistance of Counsel

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second the defendant must show the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Koncel argues his trial attorney failed to: (A) present a more "nuanced" defense theory; (B) object to a jury instruction that did not include certain language on one of the kidnapping elements; (C) object to hearsay evidence that was inconsistent with the defense theory; and (D) adequately investigate the circumstances surrounding the state medical examiner's resignation.

### A. Failure to present a "nuanced" defense theory

The jury was instructed the State would have to prove the following elements of first-degree kidnapping:

> 1. On or between March 5 and March 6, 1997, the defendant confined or removed Marty Lee Budde.
> 2. At the time the defendant began to confine or remove the victim, Marty Lee Budde was alive.
> 3. The defendant did so with the specific intent to secretly confine Marty Lee Budde.

4. The defendant knew he did not have the consent of the victim to do so.

5. As a result of the confinement or removal, Marty Lee Budde suffered a serious injury.

Koncel's trial attorney honed in on the second element. He argued Budde was not alive at the time Koncel began to confine or remove him. Specifically, he theorized that Budde died of wounds inflicted by Koncel's brother before Koncel intervened to help move the body.

On appeal, Koncel contends counsel should have argued in the alternative that if Budde was not dead before he intervened to help move the body, he was at the very least "irreversibly injured." The alternative argument, he asserts, would have countered evidence of the potential for Budde to recover from his injuries with medical intervention. In his view, "[i]f the victim is dead or about to die prior to the confinement or removal, then the confinement or removal of the body is merely incidental to the killing of the victim and no conviction for kidnapping lies."

Koncel's attorney testified by deposition that he generally did not like making either/or arguments. In his words:

> I thought your case is never stronger than your weakest argument. And thought that would have been a weaker argument if I had made it. I guess if you are asking me to Monday morning quarterback myself, I don't know—I don't recall having that thought process.
> But having it now, I would not want to weaken my argument on element 2 by making an alternative argument on element 5. That would have been—that would be my thought process today. And perhaps that was my thought process at the time, or maybe it didn't even occur to me at the time. I don't recall. But I don't—I never liked either-or argument[s].

Counsel's strategy was reasonable. He retained an expert witness, who opined "to a reasonable degree of medical certainty" that Budde's death occurred "at the completion of the head injuries." The expert reasoned that "[t]he configuration of

the fracture lines" and "the relatively scant amount of bleeding that one finds in the brain and surrounding soft tissues" indicated "a very rapid cessation of heart and respiratory functions." He stated "the injuries as sustained here and the rapid collapse" were "irreversible."

The expert opined on Budde's specific injuries as follows: (1) "there [was] really comparatively little bleeding in the scalp compared to what one would expect to see in somebody who had lived a while with this particular injury"; (2) "circulation ceased very rapidly after" certain tears to his liver "were sustained"; and (3) "blood pressure and blood circulation had ceased very early on, and was minimal at the time . . . injuries [to Budde's ribs] were sustained" and the state medical examiner's use of the term "agonal" in characterizing the rib injuries meant they were "sustained at the time of death or during the process of dying."

As for evidence of blood in the truck used to transport Budde, the expert testified there were no "signs of arterial spurting" or "signs of significant splattering," which "would [have] be[en] definite proof of . . . circulation"; the blood on the vehicle screen could have occurred after death; and Budde "was not actively bleeding" in the woods where his body was found, meaning "[h]e was dead."

The expert acknowledged "individual respiratory functions" might "have occurred for a considerable time later," but he did not find those functions inconsistent with his opinion on the time of death. In his view, movement of a dead body could "force a small amount of air out through the windpipe and into the surrounding air."

In sum, counsel presented and supported what he believed to be the most cogent defense to the kidnapping charge—a challenge to the element requiring

Budde to have been alive before he was removed or confined. Counsel's theory that Budde died before he was moved necessarily subsumed an argument that he was "irreversibly injured" before he was moved. Although counsel's theory failed to win the day, we are not to consider "whether defense counsel's actions were successful, but whether they were 'justifiable.'" *Anfinson v. State*, 758 N.W.2d 496, 501 (Iowa 2008) (quoting *Pettes v. State*, 418 N.W.2d 53, 57 (Iowa 1988)). On our de novo review, we are persuaded that Koncel's trial attorney acted competently when he limited his defense theory to death-before-the-kidnapping rather than death-or-irreversible-injury before the kidnapping. *See Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").

Our conclusion effectively resolves Koncel's related assertion that his attorney was ineffective in failing to call the Jackson County medical examiner to testify about Budde's serious injuries. Death was the ultimate serious injury and, as discussed, the defense expert testified at length about the timing of Budde's death and the injuries leading up to it. Additionally, calling the local medical examiner to the stand carried risks. Koncel's trial attorney testified by deposition that he spoke to the medical examiner before trial, and "he was kind of coy." In counsel's words, "I remember him saying very explicitly . . . don't call me, you are not going to like what I have to say. And so I took him at his word and didn't call him." Counsel also explained that he did not depose him because "if [he] listed him and he was deposed," then he "was going to add a witness to the state's list that they didn't have." Counsel's strategy was reasonable. *See Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001) ("[S]trategic decisions made after 'thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable.'" (citation omitted)).

### B. Failure to object to jury instruction

As discussed, the second element of the marshalling instruction for kidnapping required the defendant to "confine or remove" Budde. The trial court defined the terms as follows:

> Concerning element number 1 of instruction Nos. 28 and 33, confinement or removal requires more than what is included in the commission of the crime of murder.
> A person is "confined" when his or her freedom to move about is substantially restricted by force, threat or deception. The person may be confined either in the place where the restriction began or in a place to which he or she has been removed.
> No minimum time of confinement or distance of removal is required. It must be more than slight. The confinement or removal must have significance apart from the murder. In determining whether confinement or removal exists, you may consider whether:
> 1. The risk of harm to Marty Budde was increased.
> 2. The risk of detection was reduced.
> 3. Escape was made easier.

Koncel argues the instruction "included a watered-down version of" certain language required by our case law. *See State v. Albright*, 925 N.W.2d 144, 152–53 (Iowa 2019) ("The three prongs [of the confinement-or-removal test] include confinement or removal that (1) 'substantially increases the risk of harm to the victim,' (2) 'significantly lessens the risk of detection,' or (3) 'significantly facilitates escape of the perpetrator.'"); *State v. Robinson*, 859 N.W.2d 464, 481 (Iowa 2015) ("In the end, the question calls for an exercise of our judgment as to whether, on the totality of the circumstances, the State offered sufficient evidence that a jury could find beyond a reasonable doubt that the defendant's confinement of the victim *substantially* increased the risk of harm, *significantly* lessened the risk of

detection, or *significantly* facilitated escape."); *State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981) ("Such confinement or removal may exist because it *substantially* increases the risk of harm to the victim, *significantly* lessens the risk of detection, or *significantly* facilitates escape following the consummation of the offense." (emphasis added)). In his view, "[c]ounsel acting within the range of normally competent counsel would not have failed to object to an instruction that diminished the State's burden of proving that confinement or removal was more than incidental to the underlying offense."

The jury instruction clearly failed to include the italicized language adopted in *Rich* and reaffirmed in subsequent opinions. Assuming without deciding counsel had a duty to object to the absence of that language, Koncel failed to establish *Strickland* prejudice.

According to a report of a law enforcement interview, Koncel told the investigator the brothers went south from their home "for possibly five miles," "turned right," proceeded "approximately two miles," "turned left on a gravel road that went up hill," "made a left turn and then made a right turn into a grassy area." They "drove along the tree line" before coming to a stop. It was "very dark that night." Koncel's brother went "into the woods" and appeared to be "pulling [Budde] into the woods."

Based on the report, this court characterized the site where Budde's body was found as a "secluded area." *Koncel*, 2001 WL 98611, at *1. This characterization together with the underlying evidence lead us to conclude that there was no reasonable probability of a different outcome had counsel succeeded in having the jury instruction changed from "[t]he risk of detection was reduced" to

"*significantly* lessened the risk of detection." *See Harper v. State*, No.17-0435, 2018 WL 4360892, at *9 (Iowa Ct. App. Sept. 12, 2018) ("Assuming without deciding trial counsel had a duty to object to the instruction without the intensifiers, we cannot say Harper suffered prejudice. We find no reasonable probability the jury would have returned a not-guilty verdict on the first-degree kidnapping charge had the intensifiers been included in the instruction."); *Gailey v. State*, No. 15-2183, 2017 WL 3077915, at *3 (Iowa Ct. App. July 19, 2017) ("Even assuming Gailey's trial counsel had a duty to object to the confinement instruction without the intensifiers, we cannot find Gailey suffered prejudice as a result of his counsel's omission."); *State v. Ronnau*, No. 14-0787, 2016 WL 351314, at *10 (Iowa Ct. App. Jan. 27, 2016) ("Assuming Ronnau's trial counsel had a duty to object to the confinement instruction without the intensifiers, we cannot find Ronnau suffered prejudice as a result of his counsel's omission."); *State v. Norem*, No. 14-1524, 2016 WL 146237, at *7 (Iowa Ct. App. Jan. 13, 2016) ("Assuming Norem's trial counsel had a duty to object to the confinement instruction without the intensifiers, we cannot find Norem suffered prejudice as a result of counsel's omission".); *cf. State v. Chamberlain*, No. 17-1426, 2018 WL 6719730, at *8 (Iowa Ct. App. Dec. 19, 2018) ("[A]lthough the jury could have found that Chamberlain's confinement and removal of Robin was not merely incidental to the crime of intimidation with a dangerous weapon with intent, we cannot say the record contains overwhelming evidence to compel the jury to reach that result.").

C.      *Failure to object to hearsay statement*

Koncel next contends counsel was ineffective in failing to object to hearsay evidence that undermined his theory of the case. He points to an investigator's

testimony about the interview with Koncel and, specifically, Koncel's statement that his brother returned from the woods and "told him that [Budde's] not dead, [Budde's] not dead." He also challenges the division of criminal investigation report containing the statement.

The State acknowledges Koncel's attorney could have lodged hearsay objections to this evidence but argues Koncel was not prejudiced because "compelling medical and physical evidence establish[ed] the same fact." On our de novo review, we agree.

The State medical examiner, Dr. Thomas Bennett, opined that "Mr. Budde did not die immediately." He stated, "[T]here was definite bleeding going into the soft tissues, indicating that he had blood pressure when those injuries were sustained, he was still alive when these injuries were sustained." He further opined Budde "lived for at least several minutes and could perhaps have lived for thirty minutes or longer before finally, because of these injuries, those vital functions stopped and he died." He reiterated, "[A]t least he could have lived at least thirty minutes or so." When asked about blood in the truck, he testified, "You don't get that much drainage from an individual that has received fatal head wounds after they're dead. It indicates to me that he was alive and bleeding to allow his body to push blood to the outside through these many wounds into this area." Finally, he testified to knife wounds inflicted after Budde was taken to the woods, stating, "[H]e still had evidence of circulatory function."

Based on this evidence, there is no reasonable probability of a different outcome had counsel succeeded in excluding the statements of Koncel's brother that Budde was not dead when he was taken to the woods. *See Linn v. State*, 929

N.W.2d 717, 731 (Iowa 2019) ("The ultimate question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

    *D.      Failure to adequately investigate resignation of medical examiner*

    Koncel challenges his trial attorney's failure to question Dr. Bennett in greater detail "about the circumstances of his departure from the state medical examiner's office." Counsel made a strategic decision to limit his cross-examination to the facts of the case. *See State v. Rice*, 543 N.W.2d 884, 888 (Iowa 1996) ("Counsel did not breach any essential duty to the defendant by failing to pose specific cross-examination questions defendant would prefer him to ask."). He elicited inconsistencies between Dr. Bennett's trial and deposition testimony about the time of Budde's death which, as discussed, was the crux of Koncel's defense. Although he conceded in his deposition testimony, that he "wishe[d] [he] would have explored" the circumstances surrounding Dr. Bennett's resignation "a little more," he noted Dr. Bennett was a "very charismatic witness" and he would have only questioned him if, for example, he "knew there was demonstrated proof that he had lied at a criminal trial." We conclude his failure to delve into the resignation did not amount to ineffective assistance.

## III.    Issues Sought to Be Preserved

    Koncel raises several claims of ineffective assistance of PCR counsel he would like to have this court preserve for another PCR action as well as a claim of actual innocence under *Schmidt v. State*, 909 N.W.2d 778 (Iowa 2018). He concedes recent legislation "nullifies [precedent] which . . . held that the proper mechanism for resolving claims of ineffective assistance of PCR counsel raised

for the first time on appeal is for an applicant to file a separate PCR application in the district court." *See* 2019 Iowa Acts ch. 140, § 34; Iowa Code § 822.3 (2019) ("An allegation of ineffective assistance of counsel in a prior case under this chapter shall not toll or extend the limitation periods in this section nor shall such claim relate back to a prior filing to avoid the application of the limitation periods."); *Allison v. State*, 914 N.W.2d 866, 891 (Iowa 2018) ("In order to avoid the difficult constitutional position that would result in denying a remedy where defense counsel allegedly provided ineffective assistance at trial and postconviction counsel is ineffective in raising that claim, we think the best approach is to hold that where a PCR petition alleging ineffective assistance of trial counsel has been timely filed per section 822.3 and there is a successive PCR petition alleging postconviction counsel was ineffective in presenting the ineffective-assistance-of-trial-counsel claim, the timing of the filing of the second PCR petition relates back to the timing of the filing of the original PCR petition for purposes of Iowa Code section 822.3 if the successive PCR petition is filed promptly after the conclusion of the first PCR action."). For that reason, he asks us to either remand the case for hearing on the claims or decide all but one of the claims at this time.

We decline to follow either suggested course or weigh in on the effect of the recent legislation should Koncel elect to file another PCR action raising ineffective-assistance-of-counsel claims against his PCR attorney. With respect to the actual-innocence claim, Koncel concedes the record would require "more development." Again, we decline to decide how Koncel should raise the claim or whether the claim is viable.

We affirm the denial of Koncel's postconviction-relief application.

**AFFIRMED.**