# IN THE COURT OF APPEALS OF IOWA

No. 24-0348
Filed March 5, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JASON LEVANT FERGUSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Pocahontas County, Derek Johnson,

Judge.

The defendant appeals his convictions, alleging insufficient evidence

supports the jury's verdicts. **AFFIRMED**.

Martha J. Lucey, State Appellate Defender, and Ella M. Newell, Assistant

Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.

Heard by Greer, P.J., and Langholz and Sandy, JJ.

**GREER, Presiding Judge.**

A jury found Jason Ferguson guilty of theft in the second degree and fifty timber violations involving his harvesting of trees on the Stoddard Wildlife Management Area in Pocahontas County (Stoddard Property).  Ferguson appeals his convictions, arguing that insufficient evidence underlies the jury's verdict as to all fifty-one counts.  He points to the State's alleged failure to prove when the trees were cut, that he cut or caused to be cut and appropriated fifty trees from the Stoddard Property, and that he was not acting under a mistake of fact as to who owned the trees at the time.  After review, we find sufficient evidence on the record to support the jury's verdicts and affirm Ferguson's convictions.

## I.  Background Facts and Proceedings.

The Stoddard family once owned a sliver of land abutting an old river bottom area next to the Des Moines River.  On July 24, 2020, the Stoddard family sold the land to the National Heritage Foundation (NHF), which held and maintained properties until identified properties could be transferred to government entities for use as conservation land.  The Stoddard Property was formally transferred on August 3, 2020.  On August 20, 2021, the Stoddard Property was officially transferred to the State of Iowa.

On or about October 23, 2022, a bow hunter called in a tip to authorities, alerting them to out-of-the-ordinary activity on the Stoddard Property.  Officer Spece, a conservation officer for the Iowa Department of Natural Resources (DNR), responded to the tip.  Upon arrival to the Stoddard Property, Spece observed evidence of logging, including tree stumps.  After realizing the magnitude of ecological disturbance, Spece recorded photos and waypoints of tree stumps,

equipment, and man-made trails on a phone application called "OnX." Once Spece finished walking the Stoddard Property, he returned to his vehicle and called another conservation officer, Officer Yarkosky.

Yarkosky joined Spece and transversed the property to the bank of the old Des Moines River bottom, where the officers spotted an individual, later identified as Jason Ferguson, among the undergrowth. When officers approached, Ferguson was compliant, answered questions, and voluntarily pulled out his phone to compare digital resources showing property lines. Drawing on a previous observation from a public road, Spece took a sincere special interest in a large bur oak tree in Ferguson's driveway. Spece asked Ferguson whether he would be willing to show him the tree, as Spece was a self-described "tree nerd." Ferguson agreed.

Before leaving to see the bur oak tree, the officers followed Ferguson to his car parked in the forest, asking him to open the trunk of his SUV. In the trunk were several chainsaws, industrial chains, and other miscellaneous equipment. As a storm rolled in, the men split and entered their respective vehicles; the three made their way to Ferguson's property.

On Ferguson's property, Spece and Yarkosky examined the massive bur oak tree on a trailer in Ferguson's driveway. The men conversed about that tree, other trees on Ferguson's property, and more generally about building and woodworking. The officers left Ferguson's property without incident.

The next day, Officer Nathan Haupert surveyed the Stoddard Property. Haupert, a sixteen-year veteran of the DNR, found dozens of tree stumps on the Stoddard Property. He also took note of signage marking the boundary of the

State-owned property from a neighboring privately-owned property. As more and more damage came to light, Haupert called in a reinforcement—Officer Steve Griebel, also a conservation officer for the DNR. Griebel started numbering stumps with spray paint. By the end of the day, Haupert decided to invite Kevin Oetken, an expert in forestry, onto the Stoddard Property to investigate the scope of timbering activities.

On July 12, 2023, after a thorough investigation, Oetken found more than fifty tree stumps[1] on the Stoddard Property. Oetken identified the boundaries of the Stoddard Property prior to his arrival using maps obtained from the Beacon GIS website for the county. Then, using forestry techniques, including estimating diameter at breast height for each stump and the Scribner log rule,[2] Oetken was able to approximate the monetary value of each of the fifty trees that once stood on the Stoddard Property. Special care was taken to evaluate the monetary value of the large bur oak tree, thought to be 175 years old at the time it was felled on the property. In Oetken's professional opinion, because of the tree's size and value to wildlife, the large bur oak tree had a special estimated value of $25,549. The value of the logs for the other fifty trees, including the value of logs from the bur oak tree, was $5327.92. Oetken also compared an overhead GIS photograph

---

[1] Oetken observed cut tree stumps for one bur oak, twenty-four silver maple, twenty-eight green ash, and two elm trees, but at sentencing corrected his report to reflect twenty-two silver maple trees and twenty-five green ash to match the verdicts returned by the jury.

[2] Oetken described this as a "log rule stick . . . that allows [him] to measure the diameter of the stump . . . [and] calculate the volume of the wood in the tree." He called it "Iowa's official log rule," as well as the Department of Forestry's official rule.

of the area from April 2021 to a March 2023 GIS photograph of the same area and opined that the bur oak was no longer observable in the more recent image.

Because of the scope of damage, the DNR pursued charges against Ferguson. In January 2023, the State of Iowa charged Ferguson with theft in the second degree, a class "D" felony, in violation of Iowa Code sections 714.1(1) and 714.2(2) (2022),[3] and a series of timber violations, each of which was a serious misdemeanor in violation of sections 456A.36(3)(b) and 456A.36(5)(c).[4] Ferguson gave noticed he intended to assert a justification defense.

The matter proceeded to trial. Ferguson maintained that he was acting under a mistake of fact about who owned the property and, accordingly, the trees at the time he harvested them. After a four-day trial, the jury found Ferguson guilty on all counts. At sentencing, the district court imposed a five-year suspended prison sentence; a suspended fine for Count I, second-degree theft; and a fine on each of Ferguson's fifty timber violations, for a total of $21,500, plus a 15%

---

[3] It was alleged Ferguson committed the acts between April 2021 and October 2022. As there is no substantive difference between the relevant Code sections, we use the 2022 Code throughout.

[4] Ferguson correctly sets out this statutory history in his appellate brief:

> Iowa Code [section] 456A.36 (2019) originally provided only timber buyers could be convicted of [section] 456A.36(3)(b). (Amendment to 456A.36 at 3, 1/26/24). A timber buyer is defined as someone who is engaged in the business of buying timber for sawing into lumber, processing, or resale. Iowa Code § 456A.36(1)(c) (2019) and (2022). This does not include individuals who use timber for their own use. [*Id.*] § 456A.36(1)(c) (2019) and (2022).
>
> In 2020, the statute was amended to provide any person could be convicting of cutting, causing to be cut, or appropriating timber not purchased and no longer strictly applied to timber buyers. [*Id.*] § 456A.36(3)(b) (2020). (Amendment to 456A.36 at 3). This change in the code became effective as of July 1, 2020.

(Citations to docket omitted.)

surcharge. The district court also imposed pecuniary damages in the amount of $33,254.

After trial, Ferguson filed a motion for a new trial, a motion for judgment notwithstanding the verdict, and a motion for judgment of acquittal. The district court denied all three motions.

Ferguson appeals.

## II. Standard of Review.

"Our standard of review in a sufficiency of the evidence challenge is for errors at law." *State v. Dalton*, 674 N.W.2d 111, 116 (Iowa 2004). In sufficiency-of-the-evidence challenges, "we are highly deferential to the jury's verdict," as it "binds this court if it is supported by substantial evidence." *State v. Mathis*, 971 N.W.2d 514, 516 (Iowa 2022). When determining whether substantial evidence exists, "we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* at 517 (citation omitted). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *State v. Biddle*, 652 N.W.2d 191, 197 (Iowa 2002). We evaluate all evidence in the record, not just evidence supporting guilt. *Dalton*, 674 N.W.2d at 116.

## III. Discussion.

Ferguson challenges his convictions for theft in the second degree and timber buyer violations, arguing insufficient evidence exists on the record to support his convictions. To prove theft in the second degree, the State had to establish:

> 1. On or about the 1st day of April 2021 through the 24th day of October, 2022, the defendant took possession or control of trees from Stoddard [Property].
> 2. The defendant did so with the intent to deprive the [NHF] and/or the State of Iowa of the property.
> 3. The property, at the time of the taking, belonged to the [NHF] and/or the State of Iowa.

The jury was instructed that "possession or control" meant to "secure dominion or exert control over an object, or to use an object in a manner beyond the person's authority to do so." In addition to theft, the State charged Ferguson with fifty timber buyer violations, which included the harvesting of the large bur oak tree, along with the other types of trees missing on the property. To sustain all fifty convictions, the State had to prove:

> 1. On or about the 1st day of April 2021 through the 24th day of October, 2022, the defendant did cut or cause to be cut down or appropriated [one of the specific fifty trees from the Stoddard Property] without purchasing them.
> 2. The defendant knew he had no legal right to do so.
> 3. The property, at the time of the taking, belonged to the [NHF] and/or the State of Iowa.

Ferguson alleges insufficient evidence underlies each element of his fifty timber violations.

Fundamentally, Ferguson insists the State did not introduce substantial evidence to (1) show the alleged offenses took place during an appropriate or actionable time frame, (2) rebut his contention he was acting on a mistake of fact as to who owned the trees, or (3) prove he cut or appropriated the trees on the Stoddard Property. We review these challenges.

**A. Appropriate Date Range.**

According to Ferguson, to satisfy the first element in both his theft and timber-violation counts, the State must provide substantial evidence that any

alleged theft or timber violations occurred "on or about" April 1, 2021 to October 24, 2022, the dates made part of the elements in the jury instructions. But his main focus is that the dates matter because one of the elements the State had to prove was that either the State or the NHF owned the trees on the Stoddard Property at the time of the alleged conduct. Because NHF did not purchase the Stoddard Property until August 3, 2020, the State had to show that any alleged cutting or timbering operations occurred that day or after. Likewise, Ferguson maintains that because section 456A.36 did not apply to persons not in the timber business until July 1, 2020, the State's proof could not include any timber taken down by Ferguson prior to that date. Ferguson asserts he cannot be prosecuted for a crime that did not exist before July 1, 2020, and argues the State failed to pinpoint any date that the trees on the Stoddard Property were harvested. In sum, Ferguson's date challenge advances that any trees removed before July 1, 2020 (statute date) through the date of transfer to NHF, August 3, 2020, could not be a basis for these criminal complaints.

As for any proof of the dates of removal, Ferguson points to his statements captured by DNR officers' body cameras and played for the jury, where he told the DNR officers that he started cutting trees in the winter of 2019/2020 because he was using the lumber to rebuild his home after a fire. Other than that "admission,"[5] he claims there was no proof establishing any date of removal. He argues in his appellate brief that the closest the State comes is the trial testimony that two of the trees (the bur oak and a green ash) were "freshly cut." Even then, Ferguson

---

[5] Ferguson still does not admit that he knew he was on the Stoddard Property when he harvested trees.

argues that no one defined what freshly cut meant, as the tree expert called, Kevin Oetken, opined that it might take two to three years to lose a trunk's cambium, (which helps determine if a tree was alive when felled), placing the earliest date of removal in the month of July 2020.

To the extent that Ferguson is arguing that the element of proof in the jury instructions required that he could only be convicted if the State proved he harvested the trees "on or about April 1, 2021 to October 24, 2022," we reject that position. We recognize that an "'instruction, right or wrong, becomes the law of the case' if no objection is made to the instruction." *State v. Parmenter*, No. 18-1997, 2019 WL 6907457, at *6 (Iowa Ct. App. Dec. 18, 2019) (citation omitted). But, *Parmenter* provides that "'on or about' is a legal term of art that means '[a]pproximately' and is used 'to prevent a variance between the pleading and the proof, usu[ally] when there is any uncertainty about the exact date of a pivotal event.'" *Id.* at *5 (alterations in original) (citation omitted). In *Parmenter*, the panel explored two unpublished cases of this court, where jury members requested clarification as to the reported time frame in jury instructions. As *Parmenter* summarized *State v. Cain*, No. 14-1506, 2015 WL 5285763, at *2–3 (Iowa Ct. App. Sept. 15, 2015):

> [T]he defendant was charged with assaulting the complaining witness "on or about January 20, 2013." During deliberations, the jury requested clarification on the timeframe of the alleged assault. After conferring with counsel for both parties, the district court provided a supplemental instruction that noted the date listed in the instructions was "simply a device by which it alerts an individual to a particular event" and "[i]t is the event and not the date that controls."

*Id.* at *5 (second alteration in original) (internal citation omitted).

Likewise, as *Parmenter* summarized *State v. Potter*, No. 09-0579, 2010 WL 1875649, at *1–2 (Iowa Ct. App. May 12, 2010):

> [T]he defendant was charged with sexually assaulting three complaining witnesses in three incidents in 2002, 2004 and 2008. The jury was instructed that "[t]he State does not have to prove the specific date on which the crime occurred." During closing arguments, the State told the jury the evidence used to prove the 2004 incident could be used to prove the 2002 incident, despite a jury instruction specifying the 2002 incident occurred "[o]n or about the 24th day of May 2002." During deliberations, the jury asked for clarification about the date, and, after conferring with counsel, the district court advised them to look at its earlier instruction about the dates of the alleged offenses. Neither party objected to this supplementary instruction.

*Id.* (internal citation omitted). *Parmenter* distinguished *Cain* and *Potter* from its facts by pointing to the phrase "on or about," concluding that because the phrase was wholly absent in the trial information and jury instructions for defendant Parmenter, the two date ranges at issue became discrete units. The panel rejected the contention the date ranges were approximations even when the term "on or about" was not used. *Id.* at *5–6.

And depending upon the crime alleged, "on or about" may be used in trial information to approximate the timing of alleged criminal conduct. *See, e.g.*, *State v. Brown*, 400 N.W.2d 74, 77 (Iowa Ct. App. 1986) ("The date fixed in the indictment or information for the commission of a crime is not material. . . ."); *State v. Doyle*, No. 12-1624, 2013 WL 4011089, at *4 (Iowa Ct. App. Aug. 7, 2013) ("Because we conclude time is not a material element of the offense, the dates listed in the trial information do not preclude consideration of events outside that timeframe as evidence of a course of conduct."). Consistent with *Parmenter* and parallel case law pertaining to trial information, we find the term "on or about"

transforms what would otherwise be a discrete date range to an approximation. "On or about" is a legal term of art and should remain as one in jury instructions, consistent with how the term is treated in trial information. Thus, we treat the dates listed as an approximation of when the acts occurred as suggested by the language used and not as a required element of the offense charge.

## B. Mistake of Fact.

We next address Ferguson's mistake-of-fact defense, premised on his "good faith reasonable belief" that he was harvesting the trees from the land of a neighboring farmer who gave him permission to do so. At trial, Ferguson argued the mistake of fact meant he did not have the requisite intent to commit either crime.[6]

"Mistake of fact is a defense to criminal intent where an honest and reasonable mistake precludes the existence of the mental state necessary to commit the crime." *State v. Coonley*, No. 08-0276, 2009 WL 1066780, at *1 (Iowa Ct. App. Apr. 22, 2009) (citing *State v. Freeman*, 450 N.W.2d 826, 828 (Iowa 1990)). The mistake-of-fact defense shifts the burden to the State, where the State must prove Ferguson was not acting under a reasonable mistake as it applies to the question of who owned the property. "Mistake of fact is simply a defense, and the State has the burden of negating the defense once it is put in issue." *Id.*; *see also State v. Kuhse*, 937 N.W.2d 622, 628 (Iowa 2020) ("As with any affirmative defense, the district court must instruct the jury on justification if substantial

---

[6] For theft, the State had to prove Ferguson acted "with the intent to deprive the [NHF] and/or the State of Iowa of the" trees. For the timber buyer violation, the State had to prove Ferguson "knew he had no right to do so" when he cut or caused the trees to be cut.

evidence supports the theory. The defendant bears the initial burden of producing sufficient evidence to support the instruction. Once that threshold is met, the burden shifts to the State to prove lack of justification beyond a reasonable doubt." (internal citations omitted)). Ferguson contends the State failed to present substantial evidence to show he was not acting under a mistake of fact.

Addressing the evidence presented at trial, Ferguson points to the DNR officers' body camera footage, claiming he (1) told the officers he had permission from a neighboring farmer, Dave Rittger, to harvest the trees and (2) informed the officers that he believed the State's ownership of the property "jumped around." In that footage, the jury heard Officers Yarkosky and Spece agree to "play dumb" when approaching Ferguson for the first time. After Ferguson encountered the officers on the Stoddard Property, Yarkosky asked, "I didn't know if this is State of Iowa property?" Ferguson responded, "I think some of it is." Then Yarkosky asked, "So have you talked to anybody with the State?" And Ferguson admitted, "Not with the State, nope." Spece questioned, "So what about the farmer, you talked to any of the landowners?" And Ferguson said, "I told the one, but he hasn't said nothing to me."[7]

Ferguson argues he had been "engaging in this behavior openly for a period of years and none of the farmers in the area approached him about overstepping the property lines." But the lack of objection from the neighbors does not necessarily mean permission. And in the end, the jury could consider the

---

[7] We do not have a transcript of this conversation; we have done our best at transcribing the audio from the video evidence admitted at trial.

conversation related to the other neighbors and still find that Ferguson knew he should not harvest trees in the area where the stumps were found.

In the conversation at the site, Ferguson asked, "So isn't [inaudible] somewhere around there that the land jumps around or is [it] all owned by the State now?" as he gestured outside of the area the three men were standing. Spece showed Ferguson the OnX phone application, which shows current and accurate boundary lines. Ferguson, in turn, showed the officers a website or application on his phone called "Beacon," which, according to the officers, uses assessor's data to map boundary lines. Notably, this service was the same service Oetken used to determine the boundaries. So presumably, a jury could conclude Ferguson had information to inform him of the boundaries and intentionally disregarded them.

Additionally, the State points to the signage that would have alerted Ferguson to the land's owner. At trial, several of the State's witnesses described the signage that marked the boundary of the State's land. Brian Reis, an employee of Pocohontas County Conservation, testified and confirmed the locations of boundary signs demarcating the Stoddard Property:

> In this area here, along this [Stoddard Property line], there was signage in here. And we could see signs down in this area. And then there's also boundary signs down off the road there. And we walked all the way up into here too, and there was boundary signs on the north and then boundary signs when you're coming down through here . . . .

(Ellipsis in original.) These signs, according to Haupert, were mounted "[s]hortly after the property was acquired in 2021." Both Haubert's and Reis's testimony provides sufficient evidence to find the State of Iowa posted signs around the perimeter of the Stoddard Property, identifying the property as State land and

preventing Ferguson from making an honest and reasonable mistake regarding the owner of the trees he was harvesting.

But most compelling, the jury also viewed body camera footage from the discussion at Ferguson's property. Spece and Yarkosky expressed amazement at the amount of wood at the site and Yarkosky asked "how much wood here came from the State area?" Without hesitation, Ferguson said "Well, all of it." He did identify some Black Locust wood that he got from another "guy that died," but then clarified it was only a small amount and everything else "I got from there."

From the testimony and video footage admitted at trial, a reasonable jury could find that Ferguson was aware of the boundaries of the State land but decided to harvest the trees on the land regardless. Substantial evidence exists on the record that Ferguson was not operating under a reasonable mistake of fact when he was cutting trees or collecting timber on State land.

**C. Cut, Appropriated, Took Control, or Possessed Trees After July 23, 2020.**

Again, we consider all the evidence in the record—not just the evidence supporting guilt—and review it in light most favorable to the verdicts. *See State v. Robinson,* 859 N.W.2d 464, 467 (Iowa 2015). Upon our review, the testimony, video, and photographic evidence presented during trial, including statements from Ferguson himself, provided substantial evidence from which a jury could find that harvesting activities on the Stoddard Property took place after August 3, 2020, when either the NHF or the State owned the Stoddard Property. We summarize the evidence below.

At trial, Ross Baxter, an employee of the NHF, testified that he "walked good portions of the majority" of the Stoddard Property in October 2020 when he was

en route to survey a nearby property and "did not see any evidence of trees being removed from the property."  And although Ferguson pressed Baxter over what part of the Stoddard Property he walked, Baxter still maintained that he "walked through it for an inspection."  The absence of logging on the Stoddard Property in late 2020 and early 2021 is at least partially corroborated by a satellite photo, taken in April of 2021, showing the large bur oak, presumed to be the same bur oak that was removed by Ferguson, standing on the banks of the Des Moines River. Baxter's observations and satellite imagery indicate little to no logging or cutting was conducted on the Stoddard Property before mid-2021.

The seeming absence of logging or cutting before mid-2021 loosely correlates with Ferguson's own statements.  When conservation Officers Spece and Yarkosky approached Ferguson on the Stoddard Property on October 24, 2022, Yarkosky asked Ferguson, "How many trees [have you cut] this year?" Ferguson responded, "That I've gotten this year?"  The officer responded affirmatively and after a brief period of unintelligible sound, Ferguson answered, "I have no idea, a lot, not like semi-loads, ya know what I mean, it's just me."  As part of the same conversation, Ferguson admitted that he had been "working in here for three years," but "started way back there where they went across the road, you know, with the drainage, comes onto the road, goes across the road."[8]  Near the conclusion of the conversation, he admitted that he did not keep an inventory of the logs on his property.

---

[8] The nearest public road abuts the Rittger property.  If an individual were to continue moving east, one would move through the Rittger property and cross into the Stoddard Property.

Later that same day, when Yarkosky and Spece visited Ferguson's property, the three men struck up a conversation about Ferguson's timber collection. In light of the surrounding timber, Spece mentioned a large groove in a trail coming from the greater Stoddard Property area. Ferguson admitted the groove was caused by transporting a log "last night that [he] drove home." And as for the trails, in Baxter's testimony, he also confirmed seeing no trail on the Rittger or Stoddard Property when he was there in October 2020. Ferguson's personal statements imply he conducted significant timbering or felling operations, including cutting and collecting trees, within mere days of discovery. Ferguson expressly admitted that the bur oak and a green ash wood on his property were recent acquisitions from the Stoddard Property.

Physical evidence found on the Stoddard Property points to the recent felling of trees. On October 24, 2022, only one day after officers confronted Ferguson, Griebel found three "fresh cut" stumps with sawdust next to the stump. On July 12, 2023, during expert Oetken's investigation at the Stoddard Property, the stump of the large bur oak showed signs of recent timbering—bark was still attached to the oak's former roots and the next innermost layer, the cambium, surrounded the diameter of the tree. According to Oetken, natural processes require two to three years to degrade the cambium ring from dying trees. Three years before July 12, 2023, the maximum reasonable time period consistent with Oetken's testimony, indicates the bur oak was felled no earlier than July of 2020, which is the same month and year NHF signed paperwork to acquire the Stoddard Property. Taken as a whole, substantial evidence indicates the alleged conduct occurred when either the NHF or the State owned the Stoddard Property.

Ferguson also argues, "The State relied on speculation and conjecture to establish [he] cut and possessed trees from the Stoddard Property." Ferguson maintains the State failed to introduce substantial evidence he cut, appropriated, took control, or possessed forty-nine of the fifty trees at issue, all except the large bur oak tree. *See id.* ("Substantial evidence must do more than raise suspicion or speculation." (citation omitted)). It is noteworthy that Ferguson chose a trail area that would not be readily observable. As for the timing of the harvesting, the bur oak was identified as standing in the October 2022 photograph and because its value exceeded $25,000, as Oetken testified, it alone supported the theft conviction. As for the timber violations under chapter 456A, the two freshly cut stumps and surrounding sawdust provided evidence that recent harvesting had occurred. One of those stumps was a green ash tree, and Ferguson pointed out the wood from that particular tree at his property.

In the end, we go back to the conversation at his property where Ferguson, speaking with officers, admitted that he had been transporting logs from State land to his home. On State property, during the officers' initial conversation with Ferguson, Yarkosky asked him, "Most of the wood that you've took, is it at your place?" Ferguson responds with, "yeah, either that or it's burned up." During that same conversation, he admitted that the logs he had been collecting were being milled at his property to try to "make a house" and it would take a lot of lumber to build a home. After admitting that almost all of the wood at his property came from the State area, a jury could conclude that the State met its burden of proof on all charges involving the harvesting of the trees.

After review of the record, we find substantial evidence supporting the convictions.

**IV. Conclusion.**

We affirm Ferguson's convictions.

**AFFIRMED.**